DISIDENTE UNIVERSAL DE P.R., INC., apelado y recurrente, *v.* DEPARTAMENTO DE ESTADO, apelante y recurrido.

*Número:* AC-97-18          *Resuelto:* 12 de junio de 1998

*Carlos Lugo Fiol, Procurador General, Edda Serrano Blasini, Subprocuradora General, y Miriam Álvarez Archilla, Procuradora General Auxiliar*, abogados del peticionario; *Guillermo González Alcázar*, abogado de la parte recurrida.

EL JUEZ ASOCIADO SEÑOR NEGRÓN GARCÍA emitió la opinión del Tribunal.

El 7 de diciembre de 1995 Ángel W. Padilla Piña solicitó al Departamento de Estado una *certificación de prensa* para *Disidente Universal de P.R., Inc.*, organización periodística sin fines de lucro, dedicada esencialmente a velar y denunciar las violaciones de Derechos Humanos en Cuba. Consignó que el periodismo no constituía su medio principal de vida. Por tal razón, a tenor con la Sec. 2-408(e) de la *Ley de Vehículos y Tránsito de Puerto Rico*, Ley Núm. 141 de 20 de julio de 1960, según enmendada, 9 L.P.R.A. sec. 488(e), y el Reglamento para Regir la Expedición, Renovación, Cancelación, Uso y Responsabilidades de las Certificaciones de Prensa Núm. 5285 (en adelante Reglamento Núm. 5285), 3 de agosto de 1995, Departamento de Estado, se le denegó el beneficio de una *tablilla especial de prensa.*

Luego de pedir sin éxito una reconsideración, impugnó la constitucionalidad de ambos preceptos. El 9 de diciembre de 1996, el Tribunal de Circuito de Apelaciones[1] (Hons. Amadeo Murga, Rodríguez García y Martínez Torres, Jueces) los sostuvo. Sin embargo, en reconsideración (Hons. Rossy García, Rodríguez García y Martínez Torres, Jueces), decretó su inconstitucionalidad por requerir que el periodismo constituya el medio principal de vida. Dicho foro razonó que aunque no se violaba la libertad de prensa, la legislación y la reglamentación "hacía[n] más difícil la labor del periodista". Según ese predicado, aplicó la norma de que el Gobierno no puede negar un beneficio a una persona a base de un requisito que afecte un derecho fundamental, tal como la libertad de prensa. Sostuvo que la legislación incide negativamente sobre el ejercicio de esa libertad y no basta que el interés gubernamental sea sus-

---

[1] El recurso, originalmente presentado en el Tribunal Superior, Sala de San Juan, fue trasladado al Tribunal de Circuito de Apelaciones conforme a la enmienda a la Ley Núm. 248 de 25 de diciembre de 1995, Art. 9.004(a) del Plan de Reorganización Núm. 1a de la Rama Judicial, 1994 Leyes de Puerto Rico 2829; 4 L.P.R.A. sec. 23f(a).

tancial, sino que es menester que dicho interés no pueda alcanzarse por medios más amplios de los necesarios. Se negó a aplicar el escrutinio racional o mínimo y, en su lugar, usó un escrutinio intermedio. Concluyó que aunque el interés del Estado era sustancial, el medio para alcanzarlo —clasificar a los periodistas a base de si derivan de su profesión su principal fuente de sustento— era innecesariamente amplio. Sugirió que el criterio establecido en la propia ley y reglamento, de dedicarse "de día a día" es suficiente para adelantar el interés del Estado, y que el requisito económico de "que constituya su principal medio de vida" adolece de amplitud excesiva.

En apelación, el Departamento de Estado cuestiona dicho dictamen.([2])

I

Como *único* beneficio, la Sec. 2-408 de la Ley Núm. 11 de 3 de abril de 1987, enmendatoria de la Ley de Vehículos y Tránsito de Puerto Rico, *supra,* autorizó *expedir esas tablillas especiales* a todo vehículo de motor que sea propiedad y utilice un miembro acreditado de la Prensa General Activa, o que pertenezca a una agencia o empresa noticiosa

---

([2]) Plantea:

"1. Erró el Honorable Tribunal de Circuito al aplicar al caso de autos el escrutinio intermedio para establecer la validez constitucional de la clasificación sobre que el periodismo constituyera el 'medio principal de vida' del solicitante de una credencial de prensa, cuando se trata de una reglamentación socio económica [sic] relativa al poder del Estado para reglamentar dicha profesión, cuyo escrutinio debió ser el del nexo racional o tradicional mínimo.

"2. Erró el Honorable Tribunal de Circuito al declarar la inconstitucionalidad de la sección 2-048(e) de la Ley Núm. 141 de 20 de julio de 1960, según enmendada, 9 L.P.R.A. sec. 488(e), conocida como Ley de Vehículos y Tránsito y los Artículos IIA, IIIB y IVB del *Reglamento para regir la expedición, renovación, cancelación, uso y responsabilidades de las Certificaciones de Prensa,* Núm. 5285 de 3 de agosto de 1995.

"3. Erró el Honorable Tribunal de Circuito al determinar que la sección 2-408(e), de la Ley 141 de 20 de julio de 1960, según enmendada, 9 L.P.R.A. sec. 488(e), conocida como Ley de Vehículos y Tránsito y su contraparte reglamentaria adolecen del defecto de sobrextensión (*overbreadth*) o amplitud excesiva y que por ello son inconstitucionales." Petición de *certiorari,* pág. 4.

para uso exclusivo de uno de sus miembros. Estas personas son aquellas debidamente certificadas por el Departamento de Estado, dedicados a la búsqueda de información de *día a día* para los medios noticiosos del país y para los cuales esta ocupación constituye el *medio principal de vida.*

■ El propósito de esta legislación es remedial y eminentemente socioeconómico. Así quedó diáfanamente consignado, al señalarse en su exposición de motivos, *en lo pertinente,* que

> ... [l]os miembros de la Prensa General Activa de nuestro país ... se quejan de que los agentes del orden público, al ver estacionados sus carros con la tablilla de prensa en la parte superior y la tablilla regular en la parte delantera del vehículo, les denuncian e imponen multas. ...
>
> Esta medida va encaminada a establecer una disposición *permitiendo el uso de la tablilla especial únicamente sin riesgo alguno de sufrir inconvenientes con los agentes del orden público.* Esto, además, logrará que se cumpla el objetivo principal de la Sección 2-408 de la Ley Núm. 141, el cual es *facilitar a los periodistas que puedan llevar a cabo su misión de mantener bien informado al público y desempeñar la ocupación que constituye su medio principal de vida.* (Énfasis suplido.) 1987 Leyes de Puerto Rico 28–29.

Por su parte, el Art. III del aludido Reglamento Núm. 5285, *supra,* pág. 2, provee que se expida una certificación de prensa a todo miembro de la Prensa General Activa en Puerto Rico(³) de dieciocho (18) años o más. La solicitud

---

(³) El Art. II del Reglamento para Regir la Expedición, Renovación, Cancelación, Uso y Responsabilidades de las Certificaciones de Prensa Núm. 5285 (en adelante Reglamento Núm. 5285), 3 de agosto de 1995, Departamento de Estado, págs. 1–2, define así *"Miembro de la Prensa General Activa":*

"Dueño, gerente general, directores, directores asociados, jefes de redacción, reporteros, editores, fotoperiodistas y todo personal del Departamento de Noticias de una Empresa o Corporación periodística, registrada en el Departamento de Estado de Puerto Rico y que ejerza el periodismo escrito, radial o televisado en Puerto Rico, dedicado a la búsqueda, elaboración, edición o difusión de la noticia de interés general, que se desempeñe en sus labores en forma directa y consistente para dicha Empresa o Corporación y cuya prestación de servicios está certificada por la parte servida y para el cual esta ocupación constituye su *medio principal de vida."*

debe acompañarse con una recomendación de la empresa o de la corporación periodística para la cual trabaja, que certificará que "es un miembro de la Prensa General Activa, que se desempeña en labores periodísticas o de información en forma directa y consistente para la empresa o corporación". Art. III(A) del Reglamento Núm. 5285, *supra*, pág. 3. Además, deberá consignar si dicho trabajo es su medio principal de vida.

■ Notamos, pues, que el precepto legal y el reglamentario establecen que la certificación para obtener una tablilla especial de prensa es para quienes se dediquen *de día a día a la búsqueda de información y para los cuales tal ocupación constituye su medio principal de vida.* Como corolario, quedan excluidos quienes hacen periodismo esporádica o parcialmente, sin que constituya su principal medio de sustento.

Padilla Piña argumenta que negarle la certificación sólo porque su trabajo periodístico no constituye su medio principal de vida, restringe y coarta su libertad de palabra y prensa. *No tiene razón.*

## II

■ El principio de igual protección de las leyes consagrado en el Art. II, Sec. 7 de nuestra Constitución, L.P.R.A., Tomo 1, prohíbe el discrimen *injustificado, sin exigir trato igual* para todos los ciudadanos. Se activa ante legislación o acción gubernamental que clasifique grupos y discrimine *injustificadamente* unos frente a otros. *Fac. C. Soc. Aplicadas, Inc. v. C.E.S.*, 133 D.P.R. 521 (1993); *Calo Morales v. Cartagena Calo*, 129 D.P.R. 102 (1991); *Aulet v. Depto. Servicios Sociales*, 129 D.P.R. 1 (1991); *Mercado Vega v. U.P.R.*, 128 D.P.R. 273 (1991); *Salas v. Municipio de Moca*, 119 D.P.R. 625 (1987); *M. & B.S., Inc. v. Depto. de Agricultura*, 118 D.P.R. 319 (1987); *Vélez v. Srio. de Justicia*, 115 D.P.R. 533 (1984).

Para evaluar situaciones de ese género, los tribunales examinamos la razonabilidad de la clasificación a base del escrutinio *estricto* o de *nexo racional. Rodríguez v. Depto. Servicios Sociales,* 132 D.P.R. 617 (1993); *Zachry International v. Tribunal Superior,* 104 D.P.R. 267 (1975).

■ El primero (estricto) se emplea ante clasificaciones que afectan derechos fundamentales tales como el voto, la intimidad, el culto, la expresión y otros, o se trate de clasificaciones sospechosas, o sea, aquellas establecidas por razón de raza, color, sexo, nacimiento, origen o condición social, ideas políticas o religiosas y nacionalidad. *Rodríguez Rodríguez v. E.L.A.,* 130 D.P.R. 562 (1992). Su análisis presupone la inconstitucionalidad del estatuto y, por ende, el Estado tiene que probar que la clasificación responde a un interés apremiante, y que es necesaria por no existir un medio menos oneroso para promover y alcanzar dicho interés. *San Miguel Lorenzana v. E.L.A.,* 134 D.P.R. 405 (1993); *Calo Morales v. Cartagena Calo,* supra.

■ En el otro extremo, el escrutinio de nexo racional o tradicional se utiliza en clasificaciones de tipo socioeconómico. La constitucionalidad se presume. *Rodríguez v. Depto. Servicios Sociales,* supra. Quien impugna tiene que demostrar que la clasificación es arbitraria y que no existe un nexo racional entre ella y el interés legítimo del Estado. *Vélez v. Srio. de Justicia,* supra; *M and B.S. Inc. v. Depto. de Agricultura,* supra.[4]

---

[4] En la jurisdicción federal se ha empleado un tercer escrutinio —el intermedio— cuando la clasificación afecta intereses individuales importantes, aunque no fundamentales, como los fundamentados en el sexo y la extranjería. En Puerto Rico no lo hemos adoptado. Para clasificaciones de esa índole, utilizamos el escrutinio estricto. *Almodóvar v. Méndez Román,* 125 D.P.R. 218 (1990); *León Rosario v. Torres,* 109 D.P.R. 804 (1980).

## III

■ Nuestra Constitución y la federal sitúan([5]) la libertad de prensa como un derecho fundamental. *Méndez Arocho v. El Vocero de P.R.*, 130 D.P.R. 867 (1992); *El Vocero de P.R. v. E.L.A.*, 131 D.P.R. 356 (1992); *Rodríguez Rodríguez v. E.L.A.*, supra; *Pueblo v. Arandes De Celis*, 120 D.P.R. 530 (1988); *Santiago v. Bobb y El Mundo, Inc.*, 117 D.P.R. 153 (1986); *Soto v. Srio. de Justicia*, 112 D.P.R. 477 (1982); *Aponte Martínez v. Lugo*, 100 D.P.R. 282 (1971). Su esencia estriba en impedir la restricción arbitraria *del contenido de publicaciones*, así como el medio, el lugar y la manera en que se realicen, no importa su veracidad, popularidad o simpatía.([6]) *Coss y U.P.R. v. C.E.E.*, 137 D.P.R. 877 (1995); *Aponte Martínez v. Lugo*, supra. "Si la garantía constitucional significa algo es, al menos de ordinario, que 'el Gobierno no tiene la facultad de restringir la expresión por motivo de su mensaje, ideas, objetivos o contenido.' " (Traducción nuestra y citas omitidas.) L.H. Tribe, *American Constitutional Law*, 2da ed., Nueva York, Ed. Foundation Press, 1988, pag. 790. Es la libertad de los periódicos para decidir lo que quieren imprimir y la protección al público de recibir la información tal y como es publicada. Implica, además, el derecho del periodista a tener acceso a la información que desee publicar sin trabas innecesarias. *Silva Iglecia v. F.E.I.*, 137 D.P.R. 821 (1995); *Rivera González v. Danny's Bakery*, 121 D.P.R. 304 (1988); *Miami He-*

---

([5]) El Art. II, Sec. 4 de nuestra Constitución dispone:

"No se aprobará ley alguna que restrinja la libertad de palabra o de prensa o el derecho del pueblo a reunirse en asamblea pacífica y a pedir al gobierno la reparación de agravios." Const. E.L.A., L.P.R.A., Tomo 1, ed. 1982, pág. 265.

La Primera Enmienda de la Constitución de Estados Unidos dispone:

"El Congreso no aprobará ninguna ley con respecto al establecimiento de religión alguna, o que prohíba el libre ejercicio de la misma o que coarte la libertad de palabra o de prensa; o el derecho del pueblo a reunirse pacíficamente y a solicitar del Gobierno la reparación de agravios." Const. E.L.A., *supra*, págs. 184-185.

([6]) *Va. Pharmacy Bd. v. Va. Consumer Council*, 425 U.S. 748 (1976); *Cohen v. California*, 403 U.S. 15 (1971); *Near v. Minnesota*, 283 U.S. 697 (1931); *Debs v. United States*, 249 U.S. 211 (1919).

*rald v. Tornillo*, 418 U.S. 241 (1974); *Kleindienst v. Mandel*, 408 U.S. 753 (1972); *Branzburg v. Hayes*, 408 U.S. 665 (1972). Resaltamos una vez más el valor trascendental del acceso a la información por su estrecha correspondencia con la libre expresión, pues "[s]in conocimiento de hechos no se puede juzgar; tampoco se puede exigir remedios a los agravios gubernamentales mediante los procedimientos judiciales o a través del proceso de las urnas cada (4) años". *Soto v. Srio. de Justicia*, supra, pág. 485. Véase *López Vives v. Policía de P.R.*, 118 D.P.R. 219 (1987). Nuestra sociedad democrática se nutre de corrientes liberales. Refrendamos la dimensión constitucional del derecho de acceso e información de la prensa y del público en general. Evitamos así que el Gobierno maneje los asuntos públicos en secreto y disminuya el flujo constante de información al público en menoscabo de la participación en asuntos que le conciernen. *Soto v. Srio. de Justicia*, supra, pág. 486. Sin embargo, también reconocemos que este valor de la libertad de expresión " 'no supone una irrestricción absoluta, ... [que impida] subordinarse a otros intereses cuando la necesidad y conveniencia públicas lo requieran' ". *Bonilla Medina v. P.N.P.*, 140 D.P.R. 294, 300 (1996). Véase *Velázquez Pagán v. A.M.A.*, 131 D.P.R. 568 (1992).

## IV

■ Con esta breve normativa en mente, precisemos el alcance de las disposiciones de la ley y del *reglamento* impugnadas. Es claro que la sola negativa de una certificación de prensa a Padilla Piña, per se, no le impide ni restringe su libertad de prensa. Publicar un periódico o tener acceso a la información no depende de que se expida tal certificación de prensa. *Su único efecto es no poseer el beneficio aludido de una tablilla especial.* El propósito de la Ley de Vehículos y Tránsito de Puerto Rico dista mucho de interferir con el contenido de la expresión o de la publica-

ción; por el contrario, provee al sector más dinámico y activo de la prensa un comprensible beneficio socioeconómico. Este trato particular a los miembros de la prensa que se dedican de día a día a la búsqueda de información y para quienes dicha profesión constituye su principal fuente de sustento, no infringe la garantía de libertad de prensa de los demás, pues no conlleva ni representa peligro de suprimir determinada idea o expresión.

█ La legislación y reglamentación impugnadas no están dirigidas contra determinado grupo o sector de la prensa. *Sus criterios en nada inciden sobre el tamaño o el poder de la empresa periodística. Incluso los miembros de la prensa de pequeñas empresas están incluidas en el beneficio de la tablilla especial, siempre que se dediquen diariamente al periodismo y éste represente su principal fuente de sustento.* Tampoco obstaculiza su labor; por el contrario, la promueve y facilita para quienes han hecho del periodismo su principal medio de vida. Padilla Piña no ha demostrado (no existe indicio alguno) que ella interfiera con la libertad de prensa de *Disidente Universal de P.R., Inc.*, pues no la penaliza por sus ideas o expresiones. Tampoco regula contenido alguno ni constituye una censura previa de sus publicaciones. El derecho a la tablilla *especial*, previa la certificación requerida, no es fundamental ni exige aplicar el escrutinio estricto. Como concluyó en reconsideración el Tribunal de Circuito de Apelaciones, el requisito impugnado "no restringe directamente la libertad de expresión y prensa. No prohíbe ni reglamenta la expresión o publicación de ideas". Apéndice, Anejo 1, pág. 12. Según los parámetros constitucionales pertinentes, sólo el trato arbitrario e injustificado, que constituya una carga para el periodista, viola la cláusula de libertad de prensa, mas no aquel trato que persigue beneficiar al mayor número de personas posibles.

■ Según el escrutinio mínimo o de nexo racional ante una legislación de este tipo, esencialmente socioeconómica, debemos gran deferencia al legislador cuando se utiliza como punta de lanza la cláusula de igual protección de las leyes para impugnarlas. *Marina Ind., Inc. v. Brown Bovery Corp.*, 114 D.P.R. 64 (1983). No nos corresponde enjuiciar su sabiduría. *Olazagasti v. Eastern Sugar Associates*, 79 D.P.R. 93 (1956); *Cervecería Corona, Inc. v. Srio. Obras Públicas*, 97 D.P.R. 44 (1969). De existir una razón valedera que relacione la clasificación con el interés del Estado, sostendremos su validez.

En la situación de autos, no hay duda de que la Asamblea Legislativa tuvo la intención de beneficiar al periodista que se dedica diariamente a la búsqueda de la información como medio principal de vida. Su propósito primordial fue librarlo de los inconvenientes cotidianos generados por la Policía en el área del tránsito vehicular.

Promover y facilitar la labor a la prensa y demás medios de difusión diaria es un interés importante y sustancial del Estado. Tomamos conocimiento judicial de que los estacionamientos facilitados por las agencias del Gobierno para la prensa son limitados, y aun aquellos que ostentan la tablilla especial, muchas veces no logran ni tienen un acceso garantizado. De exigirse la entrega de la tablilla especial de prensa a todo aquel que reclame ser periodista —incluso quienes ocasionalmente escriben un artículo en algún periódico o intervienen de alguna forma en la difusión o análisis de información a través de la radio o la televisión— sobrecargaría los escasos y limitados espacios de estacionamiento en el país y, a la postre, afectaría detrimentalmente la prensa diaria. No hay duda de que limitar la concesión de certificaciones de Prensa y de tablillas especiales es un medio que razonablemente promueve ese interés identificado. La clasificación, pues, está relacionada razonablemente a dicho interés.

# V

Finalmente, no nos convence el fundamento del Tribunal de Circuito de Apelaciones sobre la amplitud excesiva.

■ La *doctrina de la amplitud excesiva* se desarrolló como una técnica de análisis judicial para asegurar que la *libertad de expresión* goce la máxima protección, debido a su importancia constitucional. Al igual que la *doctrina de vaguedad*, se utiliza para examinar la constitucionalidad de una ley de su faz, *no en su aplicación.* Son excepciones a las normas de legitimación activa (*standing*), que permiten determinar si la ley afectaría los derechos de terceras personas que no se encuentran ante el tribunal. Ambas doctrinas presuponen que hay un ejercicio del derecho a la libre expresión que no podría ser legítimamente restringido por una reglamentación gubernamental. *U.N.T.S. v. Srio. de Salud*, 133 D.P.R. 153 (1993).

Si de su faz la ley es excesivamente amplia, se considera si existen medios menos onerosos para alcanzar el propósito gubernamental. R. Serrano Geyls, *Derecho Constitucional de Estados Unidos y Puerto Rico*, 1ra ed., San Juan, Ed. C. Abo. P.R., 1988, Vol. II, págs. 1319–1320.([7])

---

([7]) Es excesivamente amplio un estatuto que, además de controlar o regular actividades constitucionalmente regulables, también afecta e invade el ámbito de expresiones o conductas protegidas. G. Gunther, *Constitutional Law*, 12ma ed., Nueva York, Ed. Foundation Press, 1991. *N.A.A.C.P. v. Alabama*, 357 U.S. 449 (1958); *Thornhill v. Alabama*, 310 U.S. 88 (1940). Sin embargo, "plausiblemente puede impugnarse una ley, alegando nulidad debido a una excesiva amplitud, sólo cuando: (1) la actividad protegida constituya una parte significativa del objetivo de la ley, y (2) no exista una manera satisfactoria de separar las aplicaciones constitucionales de la ley de sus aplicaciones inconstitucionales, de forma que se puedan suprimir estas últimas, claramente y en un solo paso, del alcance de la ley". (Traducción nuestra.) L.H. Tribe, *American Constitucional Law*, 2da ed., Nueva York, Ed. Foundation Press, 1988, pág. 1022. Además, "[e]n el análisis sobre la amplitud excesiva está implícita la idea de que no debe anularse una ley de su faz, a menos que ésta impida sustancialmente la celebración de actividades protegidas .... Por lo tanto, un estatuto redactado de manera restrictiva, para que refleje la relación íntima existente entre los medios seleccionados por la legislatura y los fines permisibles del Gobierno, no es vulnerable de su faz simplemente porque alguien pudiera imaginar aplicaciones ocasionales que trasciendan los límites constitucionales". (Traducción nuestra.) Íd. "La existencia de un efecto disuasivo, incluso en el campo de los derechos protegidos por la Primera Enmienda, nunca se ha considerado como funda-

En *Pueblo v. Hernández Colón*, 118 D.P.R. 891, 899 (1987), resolvimos que para invalidar un estatuto, la amplitud excesiva tenía que ser sustancial en relación con el alcance legítimo que la medida puede tener, y "si no están afectados derechos de libertad de expresión y asociación constitucionalmente protegidos, *no procede examinar la ambigüedad [de una reglamentación]*". (Énfasis suplido.)

En el caso de autos, repetimos, el propósito principal de la legislación no es regular o controlar la libertad de prensa. Su efecto sobre ese derecho, si alguno, *es incidental*, igual al que, de ordinario, tiene toda concesión de algún privilegio sobre las personas excluidas. En su análisis constitucional, no se justifica la aplicación del escrutinio intermedio; mucho menos la anulación de esta legislación por alegada amplitud excesiva. Este tipo de legislación no exige al Estado utilizar el medio menos oneroso para alcanzar su interés; basta que esté razonablemente relacionado con la clasificación.

*Se dictará sentencia revocatoria.*

El Juez Asociado Señor Hernández Denton emitió una opinión disidente, a la cual se unió la Juez Asociada Señora Naveira de Rodón. El Juez Asociado Señor Corrada Del Río se inhibió.

---

mento suficiente, en sí y por sí, para prohibir la acción estatal." (Traducción nuestra.) *Younger v. Harris*, 401 U.S. 37, 51 (1971).

En *Broadrick v. Oklahoma*, 413 U.S. 601 (1973), se dijo que las invalidaciones por amplitud excesiva fueron generalmente inapropiadas, cuando la alegada aplicación impermisible de la ley impugnada afectaba conducta más que expresión. Desde entonces, el Tribunal Supremo federal ha indicado que la doctrina permanece disponible en ciertas circunstancias, especialmente en la impugnación de regulaciones de expresión, más que de conducta. *Schad v. Mount Ephraim*, 452 U.S. 61 (1981); *Schaumburg v. Citizens for Better Environ*, 444 U.S. 620 (1980); *Erznoznik v. City of Jacksonville*, 422 U.S. 205 (1975). En otros contextos, se han rechazado varios ataques por amplitud excesiva, reiterándose a *Broadrick v Oklahoma*, supra. *Nueva York v. Ferber*, 458 U.S. 747 (1982); *Parker v. Levy*, 417 U.S. 733 (1974); *Arnett v. Kennedy*, 416 U.S. 134 (1974).

**— O —**

Opinión disidente emitida por el Juez Asociado Señor Hernández Denton, a la cual se une la Juez Asociada Señora Naveira de Rodón.

Por considerar que el Departamento de Estado no tiene la autoridad de expedir credenciales de prensa para ser utilizadas como identificación, y que al hacerlo y adoptar como criterio para su expedición el concepto Prensa General Activa de la Ley de Vehículos y Tránsito de Puerto Rico, Ley Núm. 141 de 20 de julio de 1960, según enmendada, 9 L.P.R.A. sec. 301 *et seq.*, se ha excedido de la autoridad delegada, disentimos.

## I

Ángel Padilla Piña, Director del periódico *Disidente* solicitó en el Departamento de Estado una credencial de periodista. La empresa periodística que publica *Disidente* es Disidente Universal de Puerto Rico, Inc., una corporación sin fines de lucro dedicada a denunciar las violaciones de derechos humanos en Cuba. Acompañó con su solicitud una carta firmada por la secretaria de la corporación, en la que se hizo constar que Padilla Piña es el director del periódico y que "entre sus funciones está cubrir eventos locales e internacionales relacionados con las violaciones de los Derechos Humanos en Cuba". Apéndice, pág. 155.

A tenor con lo dispuesto en el Reglamento para Regir la Expedición, Renovación, Cancelación, Uso y Responsabilidades de la Certificaciones de Prensa Núm. 5285 de 3 de agosto de 1995 (en adelante Reglamento Núm. 5285), el Departamento de Estado denegó dicha certificación, ya que el periodismo no constituía su medio principal de vida. El señor Padilla Piña solicitó, sin éxito, una reconsideración ante el Departamento de Estado.

Acudió al Tribunal de Circuito de Apelaciones a impugnar la constitucionalidad de dicho Reglamento y de la Sec. 2-408(e) de la Ley de Vehículos y Tránsito de Puerto Rico, 9 L.P.R.A. sec. 488(e). Inicialmente, el Tribunal de Circuito de Apelaciones, Circuito Regional I (San Juan), confirmó el dictamen administrativo. Sin embargo, en reconsideración, decretó la inconstitucionalidad de los preceptos impugnados.

Dicho foro apelativo concluyó que ambas disposiciones eran inconstitucionales de su faz. Señaló que "[e]n efecto, la referida certificación y en particular la tarjeta de identificación tipo *clip-on* que expide el Departamento de Estado, es en muchas ocasiones lo único que permite a un periodista entrar a una conferencia de prensa o un área restringida al público en general". Apéndice, pág. 205. Inconforme, el Procurador General recurre ante nos.

La opinión de este Tribunal revoca al foro apelativo y concluye que tanto la Sec. 2-408(e) de la Ley de Vehículos y Tránsito de Puerto Rico, *supra*, como el Reglamento Núm. 5285 del Departamento de Estado, *supra*, se sostienen constitucionalmente por tratarse de una legislación remedial y eminentemente socioeconómica, *cuyo único beneficio es expedir una tablilla especial de prensa a los periodistas* acreditados por dicha agencia gubernamental. Considera también que el efecto de estas disposiciones sobre el derecho a la libertad de prensa, si alguno, es incidental.

Para lograr un análisis adecuado y completo de lo que verdaderamente está planteado en este caso, es necesario distinguir entre la expedición de una credencial de prensa que *identifique* a su portador como miembro de la prensa de Puerto Rico y la expedición de una certificación cuyo propósito exclusivo sea habilitar a su portador para que obtenga el beneficio de una tablilla especial de prensa que le permita estacionarse en lugares reservados para uso exclusivo de la prensa.

Lo primero, la expedición de la credencial, afecta directamente la función medular de la prensa. No hay duda de que una credencial de prensa expedida por un organismo gubernamental, que identifica a su portador como miembro de la prensa de Puerto Rico, facilita sustancialmente las labores del periodista al solicitar información y el acceso a determinadas funciones y eventos del Estado, en los cuales usualmente se requiere que la prensa se identifique como tal. Además de facilitar su labor periodística, le otorga una ventaja significativa sobre aquellos otros miembros de la prensa que no gozan de este endoso oficial.[1]

Lo segundo, el uso de una tablilla especial de prensa no incide de modo directo en el acceso a funciones y eventos o en la labor de solicitar información. Sin embargo, no hay duda de que hace más cómoda la labor de recopilar información, aspecto esencial de su trabajo como periodista.

Aclarada la diferencia entre ambos conceptos, examinemos el derecho aplicable.

## II

La decisión del Departamento de Estado se hizo al amparo del Reglamento Núm. 5285. Este reglamento, que regula las certificaciones de la prensa, fue adoptado en virtud de la autoridad conferida por el Subcapítulo II de la Ley de Procedimiento Administrativo Uniforme del Estado Libre Asociado de Puerto Rico, Ley Núm. 170 de 12 de agosto de 1988 (3 L.P.R.A. secs. 2121–2141) y por la Sec. 2-408(e) de la Ley de Vehículos y Tránsito de Puerto Rico, Ley Num. 141 de 20 de julio de 1960, según enmendada, *supra*. Art. 1 del Reglamento Núm. 5285, *supra*, pág. 1.

Examinadas estas leyes, no encontramos autorización legislativa alguna para que el Departamento de Estado ex-

---

[1] Véase nuestras expresiones en *Nadal v. Depto. de Estado*, 145 D.P.R. 744 (1998), opinión disidente.

pida certificaciones de prensa que sirvan como credenciales. Las secciones de ley, citadas como base legal por el propio reglamento, no tienen referencia alguna a las credenciales de prensa.

La Sec. 3.1 de la Ley de Procedimiento Administrativo Uniforme del Estado Libre Asociado de Puerto Rico, 3 L.P.R.A. sec. 2151, dispone cuáles serán los derechos que se habrán de salvaguardar en los procedimientos adjudicativos formales ante las agencias: la notificación oportuna, el derecho a presentar evidencia, y el derecho a una adjudicación imparcial y a que la decisión sea fundamentada en el expediente.

La otra sección de ley, citada como autoridad para el Reglamento Núm. 5285, es la Sec. 2-408(e) de la Ley Núm. 141, *supra*, conocida como la Ley de Vehículos y Tránsito de Puerto Rico (en adelante Ley Núm. 141). Esta ley autoriza al Secretario de Transportación y Obras Públicas a reglamentar todo lo concerniente al uso y a la expedición de las tablillas que identifican los vehículos de motor en Puerto Rico. La Ley Núm. 28 de 5 de mayo de 1976 (9 L.P.R.A. sec. 488) enmendó la Ley Núm. 141 y le añadió la Sec. 2-408, *supra*, con el propósito de que el Secretario de Transportación y Obras Públicas pudiese autorizar el uso de una tablilla especial de prensa para los miembros de la Prensa General Activa. Dicha sección dispone, en lo pertinente:

> (e) Para efectos de esta sección[2] la frase "miembros de la Prensa General Activa" significará aquellas personas debidamente certificadas por el Departamento de Estado que se dedican a la búsqueda de información de día a día para los medios noticiosos del país y para los cuales esta ocupación constituye su medio principal de vida.

Un examen de la disposición citada refleja que el requisito de ser miembro de la Prensa General Activa, y su con-

---

[2] Entiéndase la expedición de tablillas especiales de prensa por el Secretario de Transportación y Obras Públicas a los miembros de la Prensa General Activa.

siguiente definición, es *para el propósito exclusivo* de obtener la tablilla especial de prensa. Se le requiere al solicitante que acuda al Departamento de Estado para que éste lo certifique como miembro de la Prensa General Activa. Para ello es necesario que cumpla con dos (2) requisitos: debe dedicarse día a día a la búsqueda de información para los medios noticiosos del país, y el periodismo debe constituir su medio principal de vida. La expedición de una tablilla especial de prensa claramente es un beneficio concedido por el Estado para los miembros de la Prensa General Activa y está condicionado a que los solicitantes cumplan con los requisitos antes descritos.

Sin embargo, dicho estatuto no le otorgó poderes adicionales al Departamento de Estado para expedir certificaciones de prensa que se utilicen para *otros propósitos*. El Departamento de Estado tampoco tiene autoridad para utilizar los requisitos de la Ley de Vehículos y Tránsito de Puerto Rico como los criterios rectores para la expedición de una credencial de prensa. Nada hay en la letra de la Ley de Vehículos y Tránsito de Puerto Rico, ni en el historial de sus enmiendas,[3] que refleje la intención, ni la autorización de la Asamblea Legislativa para que se extendiese a la expedición de las credenciales de prensa los criterios antes esbozados, que fueron adoptados por las enmiendas a la Ley Núm. 141 para la expedición de las tablillas especiales de prensa.

Sin embargo, una lectura completa y cuidadosa del reglamento impugnado revela que éste expresamente reco-

---

[3] Véanse: Informe de la Comisión de Transportación y Obras Públicas de la Cámara de Representantes sobre el P. de la C. 1832 de 20 de abril de 1976, 7ma Asamblea Legislativa, 4ta Sesión Ordinaria, para adicionar la Sec. 2-408(e) a la Ley Núm. 141 de 20 de julio de 1960 (9 L.P.R.A. sec. 488(e)); Informe de la Comisión de Transportación y Obras Públicas de la Cámara de Representantes sobre el P. de la C. 228 de 20 de marzo de 1986, 10ma Asamblea Legislativa, 2da Sesión Ordinaria, para disponer el uso único de una tablilla especial de prensa; Informe de la Comisión de Transportación y Obras Públicas del Senado de 12 de mayo de 1986 sobre el P. de la C. 228, *supra*, para disponer el uso de una tablilla única de prensa; Discusión del P. de la C. 228, Diario de Sesiones, 12 de marzo de 1987, pág. 436; Exposición de Motivos de la Ley Núm. 11 de 3 de abril de 1987, Leyes de Puerto Rico, pág. 28.

noce que su propósito es dual. El Art. 1 dispone que el propósito del Reglamento Núm. 5285, *supra*, pág. 1, es establecer las normas para expedir, renovar, cancelar, uso y responsabilidades que conlleva el uso de las certificaciones de prensa. Este documento "certifica que su poseedor es un miembro de la Prensa General Activa en Puerto Rico y que así fue certificado por la empresa o corporación para la cual trabaja".[4] Íd. *Además*, establece un procedimiento para certificar a los "Miembros de la Prensa General Activa" para los efectos de solicitar una tablilla especial de prensa. Íd.

Es decir, según el reglamento, el Departamento de Estado se ha tomado la prerrogativa de regular todo lo concerniente a las credenciales de prensa, además de establecer un procedimiento para certificar a aquellos periodistas que por pertenecer a la Prensa General Activa pueden solicitar la tablilla especial de prensa. Cabe recalcar que, según examinamos, la autorización legislativa es sólo para lo segundo.

Al examinar el Reglamento Núm. 5285, no queda duda de que la certificación de prensa expedida es *de facto* un carnet de identificación de prensa. El Art. 3(I) del Reglamento Núm. 5285, *supra*, pág. 6, dispone que el Departamento de Estado emitirá una *certificación laminada tipo "clip-on" para que el periodista la utilice en su vestimenta y sea visible cuando desempeña sus funciones en la calle.*

Del propio reglamento se desprende el propósito de que dicha certificación sirva como identificación. El Art. 4(A) del Reglamento Núm. 5285, *supra*, pág. 6, claramente dispone:

> El solicitante [a quien] se le expida una Certificación de Prensa podrá utilizarla tan sólo como certificación de que es un miembro de la Prensa General Activa dedicado a la búsqueda

---

[4] Art. 2(B) del Reglamento para Regir la Expedición, Renovación, Cancelación, Uso y Responsabilidad de las Certificaciones de Prensa Núm. 5285 de 3 de agosto de 1995, Departamento de Estado (en adelante Reglamento Núm. 5285).

de información de día a día para un medio noticioso debidamente registrado y para el que dicha labor constituye su medio principal de vida.

Esta certificación tan sólo *servirá como método de identificación* cuando su portador esté cubriendo eventos asignados por el medio noticioso para el cual labora y como certificación requerida por la Ley Núm. 141, Sección 2-408(e), [*supra*]. (Énfasis suplido.)

El reglamento dispone que sólo podrán solicitar una certificación de prensa los mayores de dieciocho (18) años que sean miembros de la Prensa General Activa, según definido el concepto en el propio Reglamento. Art. III del Reglamento Núm. 5285, *supra*. El Art. II(A) del citado Reglamento, págs. 1–2, define el término Miembro de la Prensa General Activa como:

Dueño, gerente general, directores, directores asociados, jefes de redacción, reporteros, editores, fotoperiodistas y todo personal que realice trabajo periodístico y que forme parte del personal del Departamento de Noticias de una empresa o corporación periodística, registrada en el Departamento de Estado de Puerto Rico y que ejerza el periodismo escrito, radial o televisado en Puerto Rico, dedicado a la búsqueda, elaboración, edición o difusión de la noticia de interés general, que se desempeñe en sus labores en forma directa y consistente para dicha empresa o corporación y cuya prestación de servicios está certificada por la parte servida y para el cual esta ocupación constituye su medio principal de vida. Reglamentos del Estado Libre Asociado de Puerto Rico, sec. 202(A).

Es decir, a tenor del Reglamento Núm. 5285, la condición de dedicarse día a día a la búsqueda de información para los medios noticiosos del país y de que el periodismo constituya el medio principal de vida del miembro de la prensa es un requisito tanto para la credencial como para la certificación que permite obtener la tablilla especial de prensa.

El reglamento adopta el criterio de la Ley Núm. 141, según enmendada, *establecido para propósitos exclusivos de expedir tablillas especiales de prensa*, y lo incorpora y traspone a la función de expedir credenciales. Además, sin

tener la autorización legislativa para ello, se atribuye la función de expedir credenciales de prensa que sirven de identificación. Esta no fue la intención ni la autorización otorgada por la Asamblea Legislativa al Departamento de Estado. Examinado desde esta perspectiva, se desprende que el Reglamento Núm. 5285 se excedió de la autoridad delegada y resulta claramente *ultra vires.*

Nuestra doctrina y jurisprudencia, siguiendo los postulados del Tribunal Supremo de Estados Unidos, ha reconocido la delegación del poder de reglamentar en las agencias y los departamentos de la Rama Ejecutiva. Sin embargo, a pesar de reconocer la validez constitucional de los estándares de delegación generales y amplios, hemos reiterado que un reglamento no puede excederse o extralimitarse de. la delegación concedida. Un reglamento que se extralimita de lo autorizado por el mandato legislativo es nulo e insostenible. El proceso analítico, que debe seguirse al examinar la validez de un reglamento, requiere como punto de partida determinar si la actuación administrativa está autorizada por la ley habilitadora. *M. & B.S., Inc. v. Depto. de Agricultura,* 118 D.P.R. 319, 326 (1987); *Carrero v. Depto. de Educación,* 141 D.P.R. 830 (1996).

Nada hay en las leyes habilitadoras del Reglamento Núm. 5285 que autorice al Departamento de Estado a expedir credenciales de prensa que sirvan como medio de identificación, y mucho menos a hacer extensivo los criterios restrictivos diseñados para la expedición de tablillas especiales de prensa a la expedición de esas credenciales de prensa.

La situación es más grave aún si consideramos que se trata de un asunto que afecta las funciones medulares de la prensa. El Departamento de Estado se ha abrogado la facultad de identificar y definir quién pertenece a la prensa en Puerto Rico. Al exigir que un miembro de la prensa cumpla con los requisitos de dedicarse día a día a la bús-

queda de información y que éste sea su medio principal de vida como requisito de umbral para expedirle una credencial de prensa que le servirá como identificación al llevar a cabo sus labores periodísticas, restringe de manera peligrosa la definición de prensa en Puerto Rico e incide de un modo inaceptable en el derecho a la libertad de prensa reconocido en el Art. II, Sec. 4 de nuestra Constitución, L.P.R.A., Tomo 1, y en la Primera Enmienda de la Constitución de Estados Unidos de América.

Nuestros pronunciamientos anteriores han adoptado una visión amplia y abarcadora del concepto *prensa*. También hemos otorgado gran respeto y protección a la labor de la prensa:

> ... "Lo que se debe proteger no es la *institución* en sí, sino la *labor* de la prensa: viabilizar un vehículo de información y opinión, informar y educar al público, ofrecer críticas, proveer un foro para la discusión y el debate, y actuar como un sustituto para obtener noticias e información para sus lectores, que por sí y como individuos no pueden o no desean compilarla. Una garantía especial de la libertad de prensa deberá aplicar no solamente a aquellos que la corte podía clasificar como 'prensa' sino a quienquiera, de cualquier tamaño, y cualquier medio, que regularmente asuma la misión de prensa". (Énfasis en el original.) *Oliveras v. Paniagua Diez*, 115 D.P.R. 257, 268 (1984).[5]

Esta posición es cónsona con los pronunciamientos del Tribunal Supremo de Estados Unidos:

> The liberty of the press is not confined to newspapers and periodicals. It necessarily embraces pamphlets and leaflets. ... The press in its historic connotation comprehends every sort of publication which affords a vehicle of information and opinion. *Lovell v. Griffin*, 303 U.S. 444, 452 (1938).

---

[5] El Hon. Juez Antonio Negrón García, juez ponente, citó y tradujo con aprobación de B.J. Chamberlin y C.J. Brown, *The First Amendment Reconsidered*, Nueva York, Ed. Longman, 1982, pág. 110.

## III

Una vez determinado que el Reglamento Núm. 5285 es inválido por excederse de la autoridad delegada por la Asamblea Legislativa, nos corresponde analizar cuidadosamente la sección de la Ley de Vehículos y Tránsito de Puerto Rico que autoriza la expedición de unas tablillas especiales para la prensa, para determinar si infringe alguna cláusula constitucional.

Somos de la opinión de que la primacía de la libertad de expresión y de prensa en nuestro ordenamiento constitucional requiere un análisis más cuidadoso y exhaustivo, tanto de la situación de hechos presentada ante nos como del derecho aplicable, que la llevada a cabo por la opinión de este Tribunal. *Méndez Arocho v. El Vocero de P.R.*, 130 D.P.R. 867 (1992); *El Vocero de P.R. v. E.L.A.*, 131 D.P.R. 356 (1992); *Aponte Martínez v. Lugo*, 100 D.P.R. 282 (1971).

De los hechos y de la ley se desprende que el Estado ha establecido un trato diferente para varios miembros de la prensa. A través del criterio establecido para definir la Prensa General Activa, ha otorgado selectivamente el beneficio de unas tablillas especiales de prensa. El hecho de que se trata de un beneficio no conlleva que el análisis que hagamos pueda ser menos riguroso. Los tribunales, ante una alegación de inconstitucionalidad, han rehusado distinguir entre derechos o privilegios. *Goldberg v. Kelly*, 397 U.S. 254, 262 (1970).

Cuando es el Estado quien distingue, ya sea para imponer cargas o beneficios, entre sectores de la prensa o entre miembros de la prensa, hay que examinar las disposiciones impugnadas tanto bajo la cláusula de igual protección de las leyes como bajo la protección sustantiva del derecho a la libre expresión y prensa garantizado por la Primera Enmienda de la Constitución federal. Véanse, a modo ilustrativo: *Borreca v. Fasi*, 369 F. Supp. 906 (D. Haw. 1974); *Con-*

*sumers Union of U.S., Inc. v. Periodical Corresp. Ass'n.*, 365 F. Supp. 18, 25 (D. D.C. 1973); *Quad-City Community News Service, Inc. v. Jebens*, 334 F. Supp. 8 (S.D. Iowa 1971). Un trato diferencial entre sectores o miembros de la prensa implica tanto la cláusula de igual protección de las leyes como la Primera Enmienda, y es particularmente sospechoso. *McCoy v. Providence Journal Co.*, 190 F.2d 760 (1er Cir. 1951). La situación ante nos requiere, pues, un análisis al amparo de ambas cláusulas constitucionales, y sus parámetros deben satisfacerse para que la sección de ley impugnada pueda sostenerse.

Un estatuto que de su faz diferencia entre los miembros de un sector particular de la prensa en la imposición de una carga o en la concesión de un beneficio, es de por sí sospechoso.([6]) *Grosjean v. American Press Co.*, 297 U.S. 233, 251 (1936). El hecho de que no exista un motivo o una intención discriminatoria por parte de la Asamblea Legislativa no cura esta sospecha. Para que surja una violación a la Primera Enmienda no es condición indispensable que exista un motivo ilícito. *Minneapolis Star v. Minnesota Comm'r of Rev.*, 460 U.S. 575, 591–592 (1983).

Toda disposición que diferencie entre sectores o miem-

---

([6]) El Tribunal Supremo federal ha tenido la oportunidad de examinar estos postulados en los casos sobre la imposición de impuestos a la prensa. La prensa no está inmune a que el Estado le imponga impuestos sobre el uso y las ventas, pero la Primera Enmienda de la Constitución federal impone ciertas restricciones al Estado. La jurisprudencia ha identificado cuatro (4) supuestos que, debido a la carga que imponen a la libertad de prensa, se presumen inconstitucionales: cuando el esquema contributivo responde a un propósito legislativo ilícito; cuando se trata de un impuesto que se impone sólo a la prensa; cuando se trata de un impuesto que se impone a base del contenido de la publicación, y cuando se trata de un esquema selectivo en el cual se señala para trato diferencial a algunos miembros de un sector de la prensa. *Grosjean v. American Press Co.*, 297 U.S. 233 (1936); *Minneapolis Star v. Minnesota Comm'r of Rev.*, 460 U.S. 575 (1983); *Arkansas Writers' Project, Inc. v. Ragland*, 481 U.S. 221 (1987); *Leathers v. Medlock*, 499 U.S. 439 (1991).

Se considera que un esquema contributivo impone una carga sustancial a la prensa cuando se señala a la prensa para un trato diferente o cuando se señalan para trato diferencial a algunos miembros en particular de un determinado sector de prensa. *Minneapolis Star v. Minnesota Comm'r of Rev.*, supra, págs. 583–591. Un esquema de impuestos no puede aplicarse de modo selectivo a diferentes miembros de un mismo sector de la prensa. *Arkansas Writers' Project, Inc. v. Ragland*, supra, pág. 234.

bros de la prensa, ya sea para conceder credenciales, facilitar acceso, conceder beneficios o imponer cargas, debe someterse a un escrutinio estricto donde se le exija al Estado demostrar que dicho tratamiento diferencial obedece a un interés apremiante que no puede satifacerse de un modo menos oneroso. *Sherril v. Knight*, 569 F.2d 124 (D.C. Cir. 1977); *American Broadcasting Companies, Inc. v. Cuomo*, 570 F.2d 1080 (2do Cir. 1977); *Borreca v. Fasi*, supra; *Quad-City Community News Service, Inc. v. Jebens*, supra.

Es necesario proteger a la prensa de un trato diferenciador y selectivo por parte del Estado, ya que muchas veces es el resultado de un intento indirecto para controlar ciertas publicaciones y su contenido. Al amparo de la citada Primera Enmienda, aun en casos en los que no se ha establecido un propósito discriminatorio, los tribunales han reconocido el peligro que representa la posibilidad de que a través de establecer un trato selectivo entre miembros de la prensa, el Estado señale a aquellos sectores de la prensa que cuestionan el funcionamiento gubernamental o asumen posiciones de oposición. *American Broadcasting Companies, Inc. v. Cuomo*, supra, pág. 1083.

Conceder a ciertos miembros de la prensa un tratamiento favorable sobre otros medios de la prensa también representa un precedente peligroso:

> ... The danger in granting favorable treatment to certain members of the media is obvious: it allows the government to influence the type of substantive media coverage that public events will receive. Such a practice is unquestionably at odds with the first amendment. *Anderson v. Cryovac, Inc.*, 805 F.2d 1, 9 (1er Cir. 1986).

Corresponde, pues, a este Tribunal analizar si el criterio escogido por la Asamblea Legislativa para definir Prensa General Activa y para excluir a un sector de la prensa del beneficio particular de unas tablillas especiales de prensa, el cual indudablemente hace más cómoda y facilita su la-

bor de recopilar información, puede *de facto* incidir en el tipo de publicación que queda excluida de dicho beneficio.

Diferimos de la apreciación que hace la mayoría de que el criterio escogido no guarda relación con el tamaño o el poder de la empresa periodística, y de que la negativa de una certificación de prensa a Padilla Piña no le impide ni restringe su libertad de prensa, ya que su único efecto es el no concederle el beneficio de la tablilla especial de prensa, lo cual no afecta la publicación del periódico y el acceso a la información que ha de publicarse. Diferimos también de su conclusión de que el criterio utilizado para diferenciar entre los varios miembros de la prensa no representa el peligro de suprimir determinada idea o expresión, por lo cual no se infringe el derecho a la libertad de prensa de los miembros de la prensa excluidos del beneficio.

Es ingenuo pensar que las empresas periodísticas pequeñas o incipientes, aquellas de baja circulación o que, aunque publican regularmente sólo hacen varias ediciones al año, tengan suficientes recursos económicos para pagar a sus empleados un salario adecuado que permita que el trabajo que realizan para esa empresa periodística *sea su medio principal de vida. Por necesidad, el criterio adoptado excluye del beneficio particular de las tablillas especiales de prensa a todo un sector particular de la prensa: las empresas periodísticas con pocos recursos económicos.*

Debe ser motivo de honda preocupación el criterio económico seleccionado por la Asamblea Legislativa para definir Prensa General Activa, por la existencia de una correlación entre el poder y los recursos económicos de una empresa periodística y el contenido y punto de vista presentado por éstas. Como regla general, los periódicos que representan posiciones de minoría o de vanguardia no gozan de mucha circulación ni cuentan con suficientes recursos económicos. Al otorgar el beneficio de las tablillas especiales de prensa a base de un criterio económico, existe la posibilidad real de estar excluyendo de éste a todo un sec-

tor de la prensa que representa posiciones y puntos de vista que no gozan del endoso de la mayoría.

No hay duda, y así lo reconoce la opinión de este Tribunal, que las tablillas especiales de prensa facilitan la labor del periodista en la recopilación de información. El Disfrutar de unos estacionamientos reservados le hace más cómodo el acceso a aquellos lugares a donde debe acudir en la búsqueda de la noticia que ha de publicar. Al escoger el criterio de que el miembro de la prensa se dedique diariamente a la búsqueda de información y de que éste sea su medio principal de vida, la Asamblea Legislativa quiso beneficiar y favorecer al periodista que se dedica diariamente a la búsqueda de información como medio principal de vida. La opinión de este Tribunal considera que este es un fin legítimo y encomiable y que, por lo tanto, este trato particular a un sector de la prensa no ofende la libertad de prensa.

Sin embargo, cabe señalarse, que el derecho a la libertad de expresión y de prensa impone limitaciones sustanciales a la actuación gubernamental, aun cuando ella persiga un fin legítimo y encomiable:

> ... the First Amendment as we understand it today rests on the premise that it is government power, rather than private power, that is the main threat to free expression; and as a consequence, the Amendment imposes substantial limitations on the Government even when it is trying to serve concededly praiseworthy goals. *Turner Broadcasting System, Inc. v. F.C.C.*, 512 U.S. 622, 685 (1994), opinión disidente de la Juez O'Connor.

Aun en caso de que la mayoría de este Tribunal no estuviese de acuerdo con nuestra conclusión de que hay una correlación entre el criterio económico utilizado por la Asamblea Legislativa para otorgar el beneficio de las tablillas especiales de prensa y el tamaño, poder y contenido de la prensa, debemos señalar que la opinión de este Tribunal reconoce expresamente la posibilidad de que las disposicio-

nes impugnadas tengan un efecto incidental en la libertad de prensa. Opinión del tribunal de 12 de junio de 1998, pág. 702. Reconocida esta posibilidad, correspondía examinar dichas disposiciones bajo un criterio más estricto.

Para que pueda sostenerse una disposición que de algún modo supone una restricción incidental de uno de los derechos de expresión y de prensa garantizados por nuestra Constitución y por la Primera Enmienda de la Constitución de Estados Unidos, es necesario que dicha disposición responda a un interés gubernamental sustancial y la restricción no puede ser mayor que lo necesario para adelantar dicho interés sustancial. Este escrutinio intermedio es el que se utiliza, al amparo de la Primera Enmienda, para restricciones neutrales en su contenido, pero que imponen una carga incidental en alguno de los derechos garantizados por la libertad de expresión y de prensa. 4 *Rotunda and Nowak, Treatise on Constitutional Law* Sec. 20.18 (Supp. 1998); *Turner Broadcasting System, Inc. v. F.C.C.*, supra, pág. 661; *Turner Broadcast System, Inc. v. F.C.C.*, 520 U.S. —— (1997); *Forcade v. Knight*, 416 F. Supp. 1025, 1035 (D.C. 1976).

El Tribunal Supremo de Estados Unidos ha reconocido que cuando de las alegaciones surgen planteamientos válidos que implican la Primera Enmienda, las disposiciones impugnadas no se salvan sólo porque satisfagan el criterio de la racionalidad. La carga que debe satisfacer el Gobierno, una vez implicada la Primera Enmienda, es mayor. *City of Los Angeles v. Preferred Communications, Inc.*, 476 U.S. 488 (1986). Es inapropiado revisar, según el escrutinio racional de la cláusula de igual protección de las leyes, una clasificación impuesta por la Asamblea Legislativa que afecta una conducta protegida por la Primera Enmienda. *Police Department of Chicago v. Mosley*, 408 U.S. 92, 98–99 y 102 (1972).

# IV

Nos sentimos con el deber de levantar una última preocupación. Uno de los interrogantes que surge de los hechos planteados ante nos es a quién debe corresponder la facultad de definir lo que es prensa.(7) La labor no es sencilla, y otorgar esta facultad al sector equivocado puede tener efectos nefastos.

Hemos reconocido que

> ... la prensa constituye "un vehículo de información y opinión [para] informar y educar al público, ofrecer críticas, proveer un foro para la discusión y el debate, y actuar como un sustituto para obtener noticias e información para sus lectores, que por sí y como individuos no pueden o desean compilarla". *Santiago v. Bobb y El Mundo, Inc.*, 117 D.P.R. 153, 159 (1986).

Si consideramos que la función de la prensa incluye el revisar y evaluar la labor gubernamental para informar de ello al público, es forzoso concluir que debe de mantenerse a la prensa fuera del control gubernamental. Solo así podrá llevar a cabo su función fiscalizadora adecuadamente.

La independencia de la prensa es crucial para nuestro sistema de gobierno. Una prensa independiente es una prensa en la cual la regulación del Estado está confinada a un mínimo. Esto incluye regulaciones tanto para establecer requisitos o cargas como para otorgar beneficios. Mientras mayor injerencia se dé al organismo gubernamental

---

(7) La tarea no es fácil; tampoco existe un consenso al respecto. Algunas posiciones enfatizan la prensa como una institución, mientras que otras se enfocan en la función de la prensa. Véase M.B. Nimmer, *Is Freedom of the Press a Redundancy: What Does it Add To Freedom of Speech?*, 26 Hastings L. Journal 639 (1975); D. Lange, *The Speech and Press Clauses*, 23 U.C.L.A. L. Rev. 77 (1975).

Sin embargo, encontramos que, a nivel estatal, los estados se han visto obligados a definir prensa en algunos supuestos. Entre estos se encuentran aquellos estatutos que confieren un privilegio estatutario a los periodistas de no tener que revelar sus fuentes; la definición de prensa en los estatutos que regulan acceso a las prisiones, y los estatutos que imponen impuestos o que otorgan exenciones contributivas a la prensa.

en los asuntos de la prensa, mayor será el control del Estado sobre ella.

Como parte de nuestro análisis del Reglamento Núm. 5285, examinamos reglamentos anteriores del Departamento de Estado que regían la expedición y regulación de credenciales de prensa. El Reglamento Núm. 3879 del Departamento de Estado, vigente del 7 de febrero de 1989 al 27 de noviembre de 1992, definía, en su Art. II(B), las credenciales de prensa como la identificación que acredita que su poseedor es un periodista activo en Puerto Rico y certificado por la empresa para cual trabaja. Para ser considerado periodista bastaba que el solicitante se desempeñase en sus labores para dicha empresa en forma directa y constante y que dicha empresa certificase la prestación de dichos servicios. Art. II(A) del Reglamento Núm. 3879 del Departamento de Estado.

Dicho reglamento, al igual que el Reglamento Núm. 5285 que ya examinamos, adolecía de la carencia de autoridad para regular la expedición de credenciales de prensa, ya que su única base legal era la Sec. 3.1 del Capítulo III de la Ley de Procedimiento Administrativo Uniforme del Estado Libre Asociado de Puerto Rico, *supra*, que regula los derechos a salvaguardarse en los procedimientos adjudicativos formales en las agencias. Sin embargo, cabe resaltar que, según el anterior Reglamento Núm. 3879, *supra*, la otorgación de la credencial de prensa al periodista dependía exclusivamente de una certificación a cargo de la propia empresa para la cual laboraba. Es decir, en última instancia, correspondía a la propia empresa periodística determinar, a base de la labor realizada por sus empleados, a quién debía concedérsele una credencial de prensa. Por considerar que con este criterio se limita la intervención gubernamental a un mínimo, refrendamos dicha definición.

## V

Examinados los autos y el derecho aplicable hemos llegado a la conclusión de que el Reglamento Núm. 5285 del Departamento de Estado (que regula la expedición, renovación, cancelación, uso y responsabilidades de las certificaciones de prensa) es nulo por excederse de la autoridad concedida por sus leyes habilitadoras. Consideramos, además, que la opinión de este Tribunal aplica a la Sec. 2-408(e) de la Ley Núm. 141, *supra*, el criterio de nexo racional o mínimo sin examinar ni contestar las preguntas que necesariamente surgen cuando —de modo directo o incidental— está involucrado el derecho a la libertad de prensa.

Al ignorar esta normativa constitucional, el Tribunal Supremo establece un precedente peligroso en lo que respecta a la libertad de prensa en Puerto Rico. Más aún, cuando esto conlleva permitir que el Departamento de Estado se abrogue el derecho de poder de emitir credenciales de prensa y así determine quién puede cubrir los eventos públicos.

En unos momentos en que ciertos medios de comunicación sostienen ante los tribunales y ante la opinión pública que el Estado está discriminando contra ellos mediante la colocación de anuncios gubernamentales como represalia por sus reportajes periodísticos, es realmente sorprendente y lamentable que una mayoría de este Tribunal permita que el Estado se abrogue el poder de discriminar entre periodistas.

Por todo lo anterior nos vemos obligados a disentir.