ESTADO LIBRE ASOCIADO DE PUERTO RICO
TRIBUNAL DE APELACIONES
PANEL X

| CENTRO DE PERIODISMO INVESTIGATIVO, INC.; LUIS J. VALENTÍN ORTIZ; NOEL ALGARÍN MARTÍNEZ<br><br>Apelados<br><br>v.<br><br>JENNIFER GONZÁLEZ COLÓN, en su capacidad oficial como Gobernadora del Estado Libre Asociado de Puerto Rico; MARIELI PADRÓ RALDIRIS, en su capacidad oficial como Secretaria de Prensa de la Gobernadora del Estado Libre Asociado de Puerto Rico; OFICINA DE LA GOBERNADORA DEL ESTADO LIBRE ASOCIADO DE PUERTO RICO; DEPARTAMENTO DE ESTADO; ESTADO LIBRE ASOCIADO DE PUERTO RICO<br><br>Apelantes | TA2026AP00290 | Apelación procedente del Tribunal de Primera Instancia, Sala Superior de San Juan<br><br>Caso Núm.: SJ2025CV11515<br><br>Sobre: Sentencia Declaratoria; Injunction Preliminar y Permanente; Derecho Constitucional a Libertad de Prensa |

Panel integrado por su presidenta la Juez Grana Martínez, el Juez Ronda Del Toro y la Juez Lotti Rodríguez

**Ronda Del Toro, Juez Ponente**

# SENTENCIA

En San Juan, Puerto Rico, a 7 de abril de 2026.

El Gobierno de Puerto Rico, la Hon. Jenniffer González Colón, en su capacidad oficial como Gobernadora de Puerto Rico; el Departamento de Estado de Puerto Rico; la Sra. Marieli Padró Raldiris, en su capacidad oficial como Secretaria de Prensa de la

Gobernadora de Puerto Rico; y la Oficina de la Gobernadora (en adelante y en conjunto, Gobierno de Puerto Rico o apelantes), nos solicitan que revisemos la *Sentencia* que emitió el Tribunal de Primera Instancia, Sala de San Juan, el 23 de febrero de 2026. Mediante esta, el foro primario declaró No Ha Lugar la Moción de Desestimación y/o Sentencia Sumaria que presentaron los apelantes. Además, dictó Sentencia a favor de los demandantes Centro de Periodismo Investigativo, Inc., Luis J. Valentín Ortiz y Noel Algarín Martínez (en conjunto CPI o parte demandante). En consecuencia, emitió una sentencia declaratoria para decretar que la certificación de prensa, expedida por el Departamento de Estado al amparo de la ley 22-2000, infra, no constituye un mecanismo válido para determinar qué periodistas pueden acceder a una conferencia de prensa convocada por la gobernadora o cualquier otro/a funcionario/a de la Fortaleza. Además, emitió un *injunction* preliminar y permanente para prohibirle a los demandados aquí apelantes a exigirles a los periodistas del CPI que presenten la certificación de prensa expedida por el Departamento de Estado como requisito para acceder a las conferencias de prensa convocadas por las codemandadas, sean estas celebradas en La Fortaleza o en cualquier otro lugar, ya que esta actuación infringe su derecho a la libertad de prensa.

Por las razones que exponemos a continuación, *Revocamos* la Sentencia apelada.

**I.**

El 23 de diciembre de 2025, el Centro de Periodismo Investigativo, Inc., Luis J. Valentín Ortiz y Noel Algarín Martínez, (en adelante y en conjunto CPI), presentaron una *Demanda de Sentencia Declaratoria y Solicitud de Injunction Preliminar y*

*Permanente.* En particular, CPI se identificó como que se dedica, entre otras cosas, a la realización de investigaciones periodísticas y a la publicación de reportajes producto de tales investigaciones.

En síntesis, los demandantes alegaron que los días 14 y 16 de diciembre de 2025, personal de la Fortaleza les impidió la entrada a dicho recinto para acceder a unas conferencias de prensa convocadas por el gobierno. Ello, por estos no contar con la certificación de prensa expedida por el Departamento de Estado. Adujeron que la Certificación de Prensa que emite el Departamento de Estado no es ni nunca ha sido una identificación necesaria y obligatoria para ejercer el periodismo en Puerto Rico, incluyendo el que se requiera su obtención como condición para acceder a conferencias de prensa en La Fortaleza u otras entidades gubernamentales.[1] Señalaron que antes de 2025, a los periodistas del CPI nunca se les había exigido una Certificación de Prensa del Departamento de Estado para acceder a la Mansión Ejecutiva o cubrir alguna conferencia de prensa.[2]

Indicaron también, que en el caso de los periodistas Luis J. Valentín Ortiz y Noel Algarín Martínez, al no permitírsele el acceso a La Fortaleza para cubrir una conferencia de prensa, las partes codemandadas violaron sus derechos a ejercer como periodistas para escuchar e interrogar a funcionarios públicos sobre historias en desarrollo y asuntos de alto interés público.[3] Recapitularon que la Certificación de Prensa expedida por el Departamento de Estado no fue creada con el fin de definir quién forma parte o no de la prensa activa del País, sino para determinar quién es elegible para solicitar y obtener una tablilla especial o rótulo removible

---

[1] Apelación, apéndice 1, Demanda, pág. 8.
[2] Íd., pág. 7.
[3] Íd., pág. 16.

para acceder a estacionamientos reservados para la prensa. Agregaron que, demuestra lo anterior, que el reglamento del Departamento de Estado que rige la expedición de Certificaciones de Prensa fue promulgado conforme a la autoridad delegada en la Ley de Vehículos y Tránsito, y no en virtud de una ley que autorice a dicha entidad a crear un mecanismo de certificación de periodistas para otro fin distinto al identificado en dicha ley. Mencionaron que "al utilizar la Certificación de Prensa expedida por el Departamento de Estado como criterio para determinar qué periodistas pueden participar de conferencias de prensa del gobierno, sean estas celebradas en La Fortaleza o en otros lugares, las partes codemandadas infringen el derecho de libertad de prensa que asiste a las partes codemandantes."[4]   Junto a la demanda incluyeron varios anejos.   En particular, el Anejo 17 incluía un comunicado para el 14 de diciembre de 2025 a las 11:00 a.m. Esta describía el asunto relativo a, "Como parte de sus acciones para promover la transparencia, accesibilidad y rendición de cuentas, el Gobierno de Puerto Rico amplía su rendición de cuentas semanal a través de "Asunto Semanal"".  En cuanto a los periodistas informaron lo siguiente:

> Los periodistas deberán llevar sus acreditaciones aprobadas por el Comité de Prensa, formado por representantes de los medios, y emitidas por el Departamento de Estado.

> Para maximizar el tiempo y acceso a La Fortaleza, se pedirá que los medios acreditados por el Departamento de Estado que vayan a asistir a la conferencia de prensa confirmen antes de las 8:30 am de mañana 14 de diciembre de 2025, los recursos que cubrirán la rueda de prensa. La confirmación de asistencia de los medios podrán hacerla contestando (reply) a este correo electrónico.

---

[4] Íd., pág. 20.

En el anejo 18 incluyeron otro comunicado con una convocatoria para el 16 de diciembre de 2025 a las 9:30 am. Para los periodistas también informaron lo siguiente:

> Los periodistas deberán llevar sus acreditaciones aprobadas por el Comité de Prensa, formado por representantes de los medios, y emitidas por el Departamento de Estado acreditados por el Departamento de Estado que vayan a asistir a la conferencia de prensa confirmen antes de las 8:30 am de mañana 16 de diciembre de 2025, los recursos que cubrirán la rueda de prensa.
> La confirmación de asistencia de los medios podrán hacerla contestando (reply) a este correo electrónico.

Evaluada la demanda, el 30 de diciembre de 2025, el foro primario emitió una *Orden de Mostrar Causa* para que en cinco (5) días la parte demandada compareciera por escrito.

En reacción, el 14 de enero de 2026, la parte demandada interpuso una *Moción de Desestimación y/o Petición de Sentencia Sumaria.* En síntesis, alegaron que, "la demanda no impugna una censura de contenido ni una prohibición de acceso a la información, sino una medida neutral y razonable de acreditación con foros independientes aplicada de manera general para propósitos de seguridad, logística y orden institucional. En esencia, el pleito plantea una controversia sobre el alcance de la facultad del Poder Ejecutivo para reglamentar el acceso físico a actos oficiales en propiedades gubernamentales, actos que han sido validados reiteradamente por la jurisprudencia local y federal."[5] Señalaron que, a grandes rasgos, la reclamación surge como impugnación a una política administrativa adoptada por la Oficina de la Gobernadora de Puerto Rico dirigida a ordenar, organizar y salvaguardar el acceso a conferencias de prensa celebradas en La Fortaleza. En resumen, los demandantes alegan

---

[5] SUMAC TA, Apelación, apéndice número 9, pág. 5.

que la Oficina de la Gobernadora de Puerto Rico condiciona el acceso a conferencias de prensa a periodistas que posean una Certificación de Prensa expedida por el Departamento de Estado.[6] Adujeron que no se cumplían los requisitos para expedir remedios interdictales al amparo de la Regla 57 de Procedimiento Civil, ni la emisión de una sentencia declaratoria dado que la demanda no plantea una controversia real que amerite una intervención del Tribunal, ni existe una incertidumbre jurídica genuina que requiera ser despejada.[7]  Como fundamento a la petición de desestimación, adujeron que  la demanda no contiene una sola alegación concreta que permita inferir que el requisito de certificación de prensa se utilice como mecanismo de censura, castigo o discrimen ideológico.  Indicaron también que, "la inconformidad de los demandantes con la existencia misma del requisito administrativo, lo cual es insuficiente para establecer una violación constitucional."[8]

La Asociación de Periodistas de Puerto Rico y Overseas Press Club of Puerto Rico presentaron una moción de *Postura con Respecto a Moción Dispositiva de los Demandados.*[9]  De igual manera, los demandantes CPI, presentaron su *Moción en Cumplimiento de Orden y en Oposición a Moción de Desestimación y/o Petición de Sentencia Sumaria*[10].

Sometido el asunto, el 23 de febrero de 2026, el foro primario dictó la Sentencia cuya revisión se nos solicita.  En esta emitió la sentencia declaratoria y el injunction preliminar y permanente que peticionó la parte demandante.  Como fundamento a su determinación el foro primario razonó que, "el

---

[6] SUMAC TA, Apelación, apéndice número 9.
[7] Íd.
[8] SUMAC TA, Apelación, apéndice número 9, págs. 26-27.
[9] SUMAC TA, Apelación, apéndice número 13.
[10] SUMAC TA, Apelación, apéndice número 15.

derecho a la libertad de prensa de los demandantes se está coartando al denegarles el acceso a información gubernamental valiosa, sobre la cual puedan publicar o transmitir." Además, señaló que, "[l]a restricción impuesta de requerir la certificación de prensa, cuyo acto excede el poder delegado por ley, violenta el derecho de los demandantes a la libertad de prensa. A su vez, el denegar el acceso total a dichas conferencias de prensa, les ocasiona un daño irreparable y recurrente, sin un remedio adecuado que no sea el provisto por el injunction preliminar y permanente."[11]  Indicaron, además, que la controversia aquí suscitada es distinta, al citado caso de Ateba v. Leavitt, 133 F.4th 114 (2025), al cual aludió la parte demandada. Más adelante, el TPI expresó que los demandados "pretenden denegar el acceso a la Fortaleza mediante una certificación de prensa que no fue autorizada por ley para dicho propósito". En consecuencia, el foro primario determinó lo siguiente:

  i)     Se dicta sentencia declaratoria decretando que la certificación de prensa, expedida por el Departamento de Estado al amparo de la ley 22-2000, supra, no constituye un mecanismo válido para determinar qué periodistas pueden acceder a una conferencia de prensa convocada por la gobernadora o cualquier otro/a funcionario/a de la Fortaleza;

  ii)    Se consolida y emite un injunction preliminar y permanente prohibiendo a los demandados exigirles a los periodistas del CPI, incluyendo los aquí demandantes, que presenten la certificación de prensa expedida por el Departamento de Estado como requisito para acceder a las conferencias de prensa convocadas por las codemandadas, sean estas celebradas en La Fortaleza o en cualquier otro lugar, ya que esta actuación infringe su derecho a la libertad de prensa.

---

[11]SUMAC TA, Apelación apéndice entrada 17, págs. 18-19.

En desacuerdo, el Gobierno de Puerto Rico interpuso el recurso de Apelación con los siguientes señalamientos de error:

**PRIMER ERROR**: El TPI abusó de su facultad discrecional al dictar un injunction y sentencia declaratoria sin celebrar vista evidenciaría ni juicio, sin formular determinaciones de hechos, negándole al apelante el tener su día en corte y la oportunidad de confrontar o impugnar con prueba las alegaciones del promovente.

**SEGUNDO ERROR**: Erró el TPI al no desestimar la demanda, pues sus alegaciones no exponen una reclamación que justifique la concesión de remedio alguno ni satisfacen los requisitos rigurosos para un injunction o una sentencia declaratoria.

**TERCER ERROR**: Erró el TPI al aplicar no el aplicar el escrutinio racional para analizar la medida, en contra de la jurisprudencia aplicable.

No obstante, junto al recurso de Apelación, incluyeron otra moción del 20 de marzo de 2026, para informarnos que presentaron un *Recurso Urgente de Certificación Intrajurisdiccional y Moción en Auxilio de Jurisdicción ante el Honorable Tribunal de Supremo*. En respuesta, el 27 de marzo de 2026, el Tribunal Supremo de Puerto Rico, emitió una Resolución para denegar la petición de certificación.

Así las cosas, el 30 de marzo de 2026, le concedimos término a las partes apeladas e interventoras para presentar su posición al recurso. Según ordenado, el 6 de abril de 2026, el Centro de Periodismo Investigativo, Inc., presentó su alegato en Oposición. Evaluamos.

## II.

### A.

El entredicho Provisional, *injunction* o interdicto se trata de un recurso extraordinario discrecional, cuyos contornos se delimitan en los Artículos 675-695 que permanecen vigentes del Código de Enjuiciamiento Civil de Puerto Rico, 32 LPRA secs.

3421-3566 y por la Regla 57 de Procedimiento Civil, 32 LPRA Ap. V, R. 57. Nuestro ordenamiento jurídico reconoce tres (3) modalidades de *injunction*, éstos son:  el *injunction* permanente, *injunction* preliminar y el entredicho provisional. Ver Regla 57 de Procedimiento Civil, *supra*.

En términos generales, el "injunction" está encaminado a prohibir u ordenar la ejecución de determinado acto, con el fin de evitar que se causen perjuicios inminentes o daños irreparables a alguna persona, en casos en los que no hay otro remedio adecuado en ley. VDE Corporation v. F & R Contractors, 180 DPR 21, 40 (2010). Para determinar si procede el recurso extraordinario de *injunction* es necesario examinar si la acción que se pretende evitar o provocar, connota o no un agravio de patente intensidad al derecho del individuo que reclama una reparación urgente. *Íd*. Es decir, la parte promovente deberá demostrar que, de no concederse el remedio, sufrirá un daño irreparable. *Íd*. Un daño irreparable es aquél que no puede ser satisfecho adecuadamente mediante la utilización de los remedios legales disponibles. *Íd*; véase, además, Pérez Vda. Muñiz v. Criado, 151 DPR 355, 373 (2000). El propósito fundamental del *injunction* preliminar es, "mantener el *status quo* **hasta que se celebre el juicio en sus méritos** para que no se produzca una situación que convierta en académica la sentencia que finalmente se dicte al atender la petición de *injunction* permanente, o se le ocasionen daños de mayor consideración al peticionario mientras perdura el litigio. VDE Corporation v. F & R Contractors, *supra*, pág. 41; Rullán v. Fas Alzamora, 166 DPR 742, 764 (2006), ver, además, Mun. Ponce v. Pedro Rosselló González, 136 DPR 776, 784 (1994).

El interdicto preliminar se expide mediante notificación a la parte adversa a la que se cita a una **vista** para mostrar causa. Regla 57.2(a) de Procedimiento Civil. Asimismo, el inciso b de esta, faculta la **consolidación de la vista con el juicio en sus méritos**. Conforme a lo anterior, la referida regla dispone lo siguiente:

> (b) Consolidación de la vista con el juicio en sus méritos. Antes o después de comenzada la vista para considerar una solicitud de injunction preliminar, el tribunal podrá ordenar que el juicio en sus méritos se consolide con dicha vista. Aun cuando no se ordene la consolidación, cualquier evidencia que sea admitida en la vista sobre la solicitud de injunction preliminar y que sea admisible en el juicio en sus méritos, pasará a formar parte del expediente del caso y no tendrá que presentarse nuevamente el día del juicio. El tribunal, al emitir su resolución, dictará inmediatamente una orden, especificando los hechos que ha determinado como probados en dicha etapa y ordenando los procedimientos ulteriores que sean justos en el pleito. Regla 57(b) de Procedimiento Civil, *supra*.

Así pues, para expedir un *injunction* preliminar, se evalúa (a) la naturaleza del daño a que está expuesto la parte peticionaria; (b) la irreparabilidad del daño o **la inexistencia de un remedio adecuado en ley**; (c) la probabilidad de que la parte promovente prevalezca; (d) la probabilidad de que la causa se torne en académica; (e) el impacto sobre el interés público del remedio que se solicita, y (f) la diligencia y la buena fe con que ha obrado la parte peticionaria. Regla 57.3 de Procedimiento Civil, 32 LPRA Ap. V. (Énfasis nuestro)

Por otra parte, el *injunction* permanente se produce por una sentencia final. **Después del juicio en sus méritos** y antes de ordenar un *injunction* permanente, el Tribunal debe tomar en consideración, nuevamente, la existencia o ausencia de algún otro remedio adecuado en ley. Los factores que se deben tomar en consideración para emitir el recurso de *injunction* permanente

son: (1) si el demandante ha prevalecido en un juicio en sus méritos; (2) si el demandante posee algún remedio adecuado en ley; (3) el interés público implicado; y (4) el balance de equidades. Aut. Tierras v. Moreno & Ruiz Dev.Corp., 174 DPR 409, 428 (2008), ver, además, Regla 57.5 de Procedimiento Civil, *supra*. Procede conceder una petición de *injunction* permanente si la parte que lo solicita demuestra que no tiene ningún otro remedio en ley para evitar un daño. Senado de PR v. ELA, 203 DPR 62, 72 (2019).

Por otro lado, la Sentencia Declaratoria se rige por la Regla 59.1 de Procedimiento Civil, 32 LPRA Ap. V, la cual establece lo siguiente:

> El Tribunal de Primera Instancia tendrá autoridad para declarar derechos, estados y otras relaciones jurídicas, aunque se inste o pueda instarse otro remedio. No se estimará como motivo suficiente para atacar un procedimiento o una acción el que se solicite una resolución o sentencia declaratoria. La declaración podrá ser en su forma y efectos, afirmativa o negativa, y tendrá la eficacia y el vigor de las sentencias o resoluciones definitivas. Independientemente de lo dispuesto en la Regla 37, el tribunal **podrá ordenar una vista rápida** de un pleito de sentencia declaratoria, dándole preferencia en el calendario.

La sentencia declaratoria es un mecanismo remedial que permite anticipar la dilucidación de los méritos de cualquier reclamación ante los tribunales, siempre y cuando exista un peligro potencial contra quien la solicita. Rosario Rodríguez v. Rosado Colomer, 208 DPR 419, 427 (2021); Beltrán Cintrón et al. v. ELA et al., 204 DPR 89, 109 (2020); Senado de PR v. ELA, *supra*, pág. 71; Alcalde de Guayama v. ELA, 192 DPR 329 (2015); Sánchez *et al*. v. Srio. de Justicia *et al*., 157 DPR 360, 383-384 (2002). Además, este recurso extraordinario provee que "toda persona [...] cuyos derechos [...] fuesen afectados por un estatuto, una ordenanza municipal, un contrato o una

franquicia, [puede] solicitar una [determinación] sobre cualquier divergencia en la interpretación o validez de [estos] y [...] que se dicte una declaración de los derechos, estados u otras relaciones jurídicas que de aquéllos se deriven". Beltrán Cintrón et al. v. ELA et al., *supra*, Regla 59.2(a) de Procedimiento Civil, 32 LPRA Ap. V. Este mecanismo está disponible, aunque existan otros remedios y tiene la eficacia de una sentencia o resolución definitiva. Rosario Rodríguez v. Rosado Colomer, *supra*, pág. 428; Regla 59.1 de Procedimiento Civil, *supra*.

La persona que presenta una solicitud de sentencia declaratoria debe cumplir con los criterios de legitimación activa, a saber: "la existencia o inminencia de un daño claro y real", "no imaginario o hipotético". Senado de PR v. ELA, *supra*, pág. 70, citando a Romero Barceló v. E.L.A., 169 DPR 460, 475 (2006), Sánchez et al. v. Srio. de Justicia et al., *supra*, pág. 384. Por lo tanto, "tiene que demostrar que sufrió un daño claro y palpable; que éste es real, inmediato y preciso, y no abstracto e hipotético; que existe conexión entre el daño sufrido y la causa de acción ejercitada, y que la causa de acción surge bajo el palio de la constitución o de una ley". Mun. Fajardo v. Srio. Justicia et al., 187 DPR 245, 255 (2012), citando a P.I.P. v. E.L.A. et al., 186 DPR 1 (2012); Hernández Torres v. Hernández Colón, 131 DPR 593, 500 (1992).

**B.**

Una persona contra quien se haya presentado una reclamación judicial puede solicitar su desestimación cuando de la faz de las alegaciones de la demanda surja que alguna defensa afirmativa puede derrotar la pretensión del demandante. Véase: Regla 10.2 de Procedimiento Civil, 32 LPRA Ap. V, R. 10.2; Trans-Oceanic Life Ins. v. Oracle Corp., 184 DPR 689, 701 (2012).

En lo pertinente, la referida regla lee:

Toda defensa de hechos o de derecho contra una reclamación se expondrá en la alegación responsiva excepto que, a opción de la parte que alega, las siguientes defensas pueden hacerse mediante una moción debidamente fundamentada:

(1) Falta de jurisdicción sobre la materia.
(2) Falta de jurisdicción sobre la persona.
(3) Insuficiencia del emplazamiento.
(4) Insuficiencia del diligenciamiento del emplazamiento.
(5) Dejar de exponer una reclamación que justifique la concesión de un remedio.
(6) Dejar de acumular una parte indispensable.
 [....]
Regla 10.2 de Procedimiento Civil, *supra;* Rodríguez Vázquez et als. v. Hosp. Auxilio Mutuo, 2025 TSPR 55, 215 DPR ____ (2025).

La citada regla establece los fundamentos para que una parte en un pleito pueda solicitar la desestimación de una demanda en su contra mediante moción fundamentada por cualquiera de los motivos en ella expuestos. Asoc. Fotoperiodistas v. Rivera Schatz, 180 DPR 920, 935 (2011); El Día, Inc. v. Mun. de Guaynabo, 187 DPR 811, 820-821 (2013). En particular, la Regla 10.2(5) de Procedimiento Civil, *supra*, dispone que el demandado puede fundamentar su solicitud de desestimación en que la demanda no expone "una reclamación que justifique la concesión de un remedio". En tales casos, la desestimación solicitada se dirige a los **méritos de la controversia y no a los aspectos procesales**. Montañez v. Hosp. Metropolitano, 157 DPR 96, 104 (2002). (Énfasis nuestro).

En estos casos, a los fines de disponer de una moción de desestimación por el fundamento de que la demanda no expone una reclamación que justifique la concesión de un remedio, los tribunales vienen obligados a tomar como ciertos todos los hechos bien alegados en la demanda y considerarlos de la manera más favorable a la parte demandante. Inmob. Baleares et al. v. Colón Peña et al., 214 DPR 1109, 1128 (2024); Rivera

Sanfeliz et al. v. Jta. Dir. FirstBank, 193 DPR 38, 49 (2015); Colón Rivera et al. v. ELA, 189 DPR 1033, 1049 (2013).  Es decir, ante una moción de desestimación, los tribunales deben dar por ciertas y buenas todas las alegaciones bien hechas aseveradas en la demanda que hayan sido aseveradas de manera clara.  Ortiz Matías et al. v. Mora Development, 187 DPR 649, 654 (2013); Asoc. Fotoperiodistas v. Rivera Schatz, *supra*, pág. 935.

La demanda no deberá ser desestimada a menos que se desprenda con toda certeza que el demandante no tiene derecho a remedio alguno bajo cualquier estado de hechos que puedan ser probados en apoyo de su reclamación. Díaz Vázquez et al. v. Colón Peña et al., 214 DPR 1135, 1150 (2024); Consejo de Titulares v. Gómez Estremera et al., 184 DPR 407, 423 (2012); Pressure Vessels P.R. v. Empire Gas P.R., 137 DPR 497, 505 (1994).  Ello, debido a que lo que se ataca es un vicio **intrínseco** de la demanda, no los hechos aseverados. Díaz Vázquez et al. v. Colón Peña et al., *supra*, citando a R. Hernández Colón, *Práctica jurídica de Puerto Rico: derecho procesal civil*, 6.a ed., San Juan, Ed. LexisNexis, 2017, pág. 269.

### C.

La Ley Núm. 22-2000, también conocida como la Ley de Vehículos y Tránsito, define la prensa general activa como "aquellas personas **debidamente acreditadas por el Departamento de Estado de Puerto Rico** que se dedican a la búsqueda de información para los medios noticiosos y para quienes esta ocupación constituye su principal medio de vida". 9 LPRA sec.5001 inciso (84).   En consonancia a la mencionada definición, el Artículo 2.24 de la Ley 22-2000, 9 LPRA sec. 5025, provee para las identificaciones para miembros de la prensa general activa.  Señala el aludido artículo que, "El Secretario

expedirá un rótulo removible a un miembro bona fide de la prensa general activa, **debidamente acreditado como tal ante el Departamento de Estado de Puerto Rico**, para que identifique el vehículo de motor que sea utilizado en el desempeño de sus gestiones como miembro de la prensa general activa."

A tenor con lo anterior, el Secretario de Estado adoptó el Reglamento para Establecer la Expedición, Renovación, Cancelación y el Uso de las Certificaciones de Prensa, Reglamento Núm. 6336 del 31 de julio de 2001 (Reglamento Núm. 6336), según enmendado, el 3 de julio de 2002 por el Reglamento 6483. Este Reglamento es el que establece las normas que regirán la expedición, renovación, cancelación y uso de las Certificaciones de Prensa expedida por el Departamento de Estado, así como las responsabilidades que su utilización conlleva.  Este reglamento, fue adoptado en virtud de la Ley de Procedimiento Administrativo Uniforme del Estado Libre Asociado de Puerto Rico, y por la Ley Núm. 22 del 7 de enero de 2000, según enmendada, conocida como "Ley de Vehículos y Tránsito de Puerto Rico. Artículo 1 del Reglamento 6336.  El Reglamento, define la certificación de prensa, cataloga quien es el miembro de la prensa general activa y fija sus responsabilidades, entre otros, a saber:

El Artículo II contiene las siguientes definiciones:

A. Certificación de Prensa

Identificación expedida por el Departamento que acredita que su poseedor es Miembro de la Prensa General Activa en Puerto Rico y que así fue certificado por la empresa o corporación para la cual trabaja.

[…]

C. Miembro de la Prensa General Activa

Jefes de redacción que se desempeñan también como reporteros, reporteros, fotoperiodistas que formen parte del personal del Departamento de Noticias de una Empresa o Corporación periodística, registrada en

el Departamento de Estado de Puerto Rico y que ejerzan el periodismo escrito, radial o televisivo en Puerto Rico, dedicado a la búsqueda, elaboración, edición o difusión de la noticia de interés general, que se desempeñe en sus labores en forma directa y consistente para dicha empresa o Corporación y cuya prestación de servicios está certificada por la parte servida y para el cual esta ocupación constituye su medio principal de vida y **periodistas activos que se desempeñan como tal para varios medios de comunicación a tiempo parcial o como independientes, conocidos como "Free Lance"**.

Artículo V Responsabilidades del Miembro de la Prensa General Activa

Al solicitante que se le expida una certificación de prensa podrá utilizarla tan sólo como certificación de que es un Miembro de la Prensa General Activa dedicado a la búsqueda de información de día a día para un medio noticioso debidamente registrado y que para él dicha labor constituye su medio principal de vida.

El Reglamento 6336 fija los requisitos para solicitar una certificación de prensa.  Además, establece el procedimiento para que una Comisión representativa de los medios nombrada por el Secretario de Estado y compuesta por cinco miembros activos de los medios de comunicación; radio, prensa escrita, televisión, un periodista deportivo y la Directora de la Oficina, considerare, evalúe y presente sus recomendaciones en el término de treinta (30) días.  Con ello, el Secretario de Estado emite la Certificación de Prensa. Ver Artículos III y IV del Reglamento.

Además, el Reglamento provee el remedio de reconsideración y vista, en caso de que se negare la otorgación de una certificación a un solicitante.  Ello, a tenor con la dispuesto en la Ley 170, del 12 de agosto de 1988, según enmendada[12]. Ver Artículo VI Solicitud de Reconsideración.

---

[12] Hoy derogada por la Ley de Procedimiento Administrativo Uniforme del Gobierno de Puerto Rico, Ley 38-2017.

**D.**

Al enfrentarnos a una controversia relacionada con el derecho a la libertad de expresión y de prensa, debemos tener presente que esta protección encuentra su origen en los postulados de la Primera Enmienda de la Constitución de Estados Unidos. Const. EE. UU., LPRA, Tomo 1, ed. 2023, pág. 182. Izquierdo II v. Cruz y otros, 213 DPR 607, 619-620 (2024); Véase J. Trías Monge, Historia constitucional de Puerto Rico, San Juan, Ed. UPR, 1982, Vol. III, pág. 181.

La Primera Enmienda de la Constitución federal establece que "[e]l Congreso no aprobará ninguna ley [...] que coarte la libertad de palabra o prensa [...]". Enmda. I, Const. EE. UU., *supra*, pág. 182; Izquierdo II v. Cruz y otros, *supra*, pág. 620. Cabe destacar que, al tratarse de un derecho fundamental, esta garantía de libertad de palabra y de prensa aplica en Puerto Rico. Izquierdo II v. Cruz y otros, *supra*; Balzac v. People of Porto Rico, 258 US 298, 314 (1922). Véanse, además: Pueblo v. García Colón I, 182 DPR 129, 147 (2011); UPR v. Laborde Torres y otros I, 180 DPR 253, 288 (2010).

De manera compatible a la constitución federal, la Sección 4 del Art. II de la Constitución de Puerto Rico consagra el derecho fundamental a la libertad de expresión. Esta dispone que, "[n]o se aprobará ley alguna que restrinja la libertad de palabra o de prensa o el derecho del pueblo a reunirse en asamblea pacífica y a pedir al gobierno la reparación de agravios". Const. PR, LPRA, Tomo 1, ed. 2023, págs. 292-293. Ver, además, Pueblo v. García Colón I, *supra*, pág. 148, citando a UPR v. Laborde Torres y otros I, *supra*, pág. 288.

Como la precitada Sección 4 de nuestra Carta de Derechos tiene su origen en los postulados de la Primera Enmienda de la

Constitución de Estados Unidos el Tribunal Supremo de Puerto Rico ha adoptado el análisis utilizado por la Corte Suprema de Estados Unidos al momento de atender controversias que involucren el derecho a la libertad de expresión, entiéndase, la distinción entre la reglamentación gubernamental del contenido de la expresión vis a vis la reglamentación gubernamental del tiempo, lugar y manera de la expresión. OCS v. Point Guard Ins., 205 DPR 1005, 1019 (2020), citando a UPR v. Laborde Torres y otros I, *supra*, pág. 288; Muñiz v. Admor. Deporte Hípico, *supra*; R. Serrano Geyls, Derecho constitucional de Estados Unidos y Puerto Rico, San Juan. Ed. C. Abo. PR, 1988, Vol. II, pág. 1278; Asoc. de Maestros v. Srio. de Educación, *supra*, pág. 769.

En el contexto particular de la libertad de prensa, su esencia estriba en impedir la restricción arbitraria del contenido de publicaciones, así como el medio, lugar y la manera que se realicen, no importa su veracidad, popularidad o simpatía. Disidente Univ. de P.R. v. Depto. de Estado, 145 DPR 689, 697 (1998). "Si la garantía constitucional significa algo, es, al menos de ordinario, que 'el gobierno no tiene la facultad de restringir la expresión a base de su mensaje, ideas, objetivos o contenido'" Disidente Univ. de P.R. v. Depto. de Estado, *supra*, traduciendo y citando a Tribe, American Constitutional Law, second edition, 1988, pág. 790. Es la libertad de los periódicos para decidir lo que quieren imprimir y la protección al público de recibir la información tal y como es publicada. Disidente Univ. de P.R. v. Depto. de Estado, *supra*. Implica, además, el derecho del periodista a tener acceso a la información que desea publicar sin trabas innecesarias. Disidente Univ. de P.R. v. Depto. de Estado, *supra;* Silva Iglesia v. Panel Sobre el Fiscal Especial Independiente, 137 DPR 821 (1995); Rivera González v. Danny's

Bakery, 121 DPR 304 (1988); Miami Herald v. Tornillo, 418 US 241 (1974); Kleindienst v. Mandel, 408 US 762 (1972); Branzburg v. Hayes, 408 US 665 (1972).

Así pues, el derecho a la libertad de expresión abarca "'el ámbito general de la libertad de conciencia, de pensamiento, de expresión, y las actividades propias para ejercitar a plenitud dentro de la más dilatada libertad la totalidad de esos derechos'". OCS v. Point Guard Ins., supra, citando a UPR v. Laborde Torres y otros I, supra, pág. 286 (2010), otras citas omitidas. Es por esto, que la referida cláusula constitucional es raíz indiscutible de nuestro sistema democrático de gobierno y, como tal, los tribunales estamos llamados a su más cautelosa protección. OCS v. Point Guard Ins., supra; UPR v. Laborde Torres y otros I, supra, págs. 286-287; Vigoreaux Lorenzana v. Quizno's, 173 DPR 258, pág. 260 (2008); Asoc. de Maestros v. Srio. de Educación, 156 DPR 754, pág. 768 (2002); Mari Brás v. Casañas, 96 DPR 15, 20-21 (1968).

Ahora bien, la referida garantía constitucional no es un derecho absoluto pues puede subordinarse a otros intereses cuando la necesidad y conveniencia pública lo requieran. OCS v. Point Guard Ins., supra; ver, además, Izquierdo II v. Cruz y otros, supra, pág. 619; UPR v. Laborde Torres y otros I, supra, pág. 287; Asoc. de Maestros v. Srio. de Educación, supra, pág. 768; Mari Brás v. Casañas, supra; Disidente Univ. de P.R. v. Depto. de Estado, supra, pág. 698. Por esa razón, se ha reiterado que el referido derecho está sujeto a la imposición de limitaciones, siempre y cuando estas sean interpretadas restrictivamente, de manera que no abarquen más de lo necesario. OCS v. Point Guard Ins., supra; UPR v. Laborde Torres y otros I, supra; Muñiz v. Admor. Deporte Hípico, 156 DPR 18, 24 (2002); Velázquez Pagán

v. A.M.A., 131 DPR 568, 576 (1992). Es por ello, que este derecho constitucional "puede subordinarse a otros intereses cuando la necesidad y la conveniencia pública lo requieran". Izquierdo II v. Cruz y otros, *supra*; UPR v. Laborde Torres y otros I, *supra*, pág. 287.

En el pasado, el Tribunal Supremo local, en Disidente Univ. de P.R. v. Depto. de Estado, *supra*, evaluó el derecho de la libertad de prensa *vis* a *vis* con la Sec. 2-408(e) de la Ley de Vehículos y Tránsito de PR y el entonces vigente Reglamento Para Regir la Expedición, Renovación, Cancelación, Uso y Responsabilidades de las Certificaciones de Prensa.

En el referido caso el Sr. Ángel W. Padilla Piña solicitó al Departamento de Estado certificación de prensa para la organización periodística Disidente Universal de PR, Inc., y esta le fue denegada por no cumplir con ciertas disposiciones del antes mencionado reglamento. En consecuencia, se le denegó el beneficio de una tablilla especial de prensa. En ese contexto, el Tribunal Supremo evaluó el alcance de las disposiciones de ley y reglamento impugnadas. Determinó entonces que, "[e]s claro que la sola negativa de una certificación de prensa a Padilla Piña, *per se,* no le impide ni restringe su libertad de prensa. Publicar un periódico o tener acceso a la información no depende de que se expida tal certificación de prensa." Disidente Univ. de P.R. v. Depto. de Estado, *supra*, pág. 699. Agregó el Foro Supremo que, "El propósito de la Ley de Tránsito dista mucho de interferir con el contenido de la expresión o publicación". Íd. Indicó, además, que "no infringe la garantía de libertad de prensa de los demás, pues no conlleva o representa peligro de suprimir determinada idea o expresión." Íd. Más adelante, expresó que, "la legislación y reglamentación impugnada no están dirigidas contra

determinado grupo o sector de la prensa." El Tribunal Supremo también consideró que Padilla Piña no demostró, ni existe indicio alguno, de que, "la misma interfiera con la libertad de prensa de Disidente Universal de P.R., Inc., pues no la penaliza por sus ideas o expresiones. Tampoco regula contenido alguno ni constituye censura previa de sus publicaciones." Íd, pág. 699.  Entendió el foro que el requisito de la certificación como paso previo al derecho a la tablilla especial, "no es fundamental ni exige aplicar el escrutinio estricto." Íd.  Agregó que el requisito impugnado "no restringe directamente la libertad de expresión y prensa. No prohíbe ni reglamenta la expresión o publicación de ideas". Íd. Agregó que, "[b]ajo los parámetros constitucionales pertinentes, sólo el trato arbitrario e injustificado, que constituya una carga para el periodista, viola la cláusula de libertad de prensa, mas no aquel trato que persigue beneficiar al mayor número de personas posibles." Íd.  Al validar la legislación y el reglamento el foro Supremo local reiteró que, "el propósito principal de la legislación no es regular o controlar la libertad de prensa. Su efecto sobre ese derecho, si alguno, es incidental, igual al que de ordinario tiene toda concesión de algún privilegio sobre las personas excluidas". Íd., pág. 702.  En conclusión, en Disidente Univ. de PR v. Departamento de Estado, *supra*, quedó claro que el acto de denegar una certificación de prensa no impide ni restringe la libertad de prensa de un solicitante.

En el caso particular para entrar a una conferencia de prensa de la Gobernadora, procede remitirnos al caso de Ateba v. Leavitt, 133 F.4th 114, (Cir. D.C. 2025).  Allí el foro apelativo atendió una controversia en la que el Sr. Simon Ateba (periodista) impugnó la constitucionalidad de la política de la Casa Blanca de emitir un "hard pass" (pase permanente) para reporteros según

la credencial otorgada por The Supreme Court Press Gallery o por el Senado o la Cámara de Representantes. El propósito de requerir la acreditación es para asegurarse que los que posean el *hard pass* son reporteros *bona fide*. Ateba arguyó que la política de Casa Blanca de requerir un "hard pass" violentaba la primera enmienda porque creaba una carga para su acceso al área de prensa y condicionaba su acceso total al requerirle una acreditación, la cual estaba en la discreción del Senate Daily Press Gallery. El Tribunal de Apelaciones denegó el petitorio de Ateba de que se violentaba la primera enmienda. Ello porque la política de obtener un *Hard Pass* era razonable y neutral.

Allí se informó que Casa Blanca era la residencia oficial del Presidente de los Estados Unidos de Norteamérica. 3 USC Sec. 102. Se indicó también que el área de prensa es donde los periodistas asisten a ruedas de prensa, entrevistan a funcionarios de la Casa Blanca e informan sobre las actividades diarias de la administración. Se indicó que Casa Blanca emite dos tipos de pases que le otorgan acceso a los reporteros al área de prensa. Uno para entrar al área de prensa sin escolta y otro denominado "day pass" el cual le requiere a los reporteros someter diariamente una forma para entrar al área de prensa. En este, debe esperar un escolta en el portón. Los tenedores de ambos pases tienen los mismos privilegios una vez estén adentro de las facilidades. Ver Ateba v. Leavit, *supra*, pág. 117. En cuanto a la Hard Pass Policy se indicó lo siguiente:

> The Hard Pass Policy also requires applicants to be employed by a news organization; to have a physical address, whether residential or professional, in the greater Washington, D.C., area; to be assigned to cover the White House on a regular basis; to have accessed the White House at least once during the previous six months for work or to have proof of employment within the last three months to cover the White House; and to submit to an investigation by the

Secret Service, if necessary. <u>Ateba v. Leavit</u>, *supra*, pág. 117.

En junio de 2023, Ateba solicitó en el Senate Daily Press Gallery la credencial del *hard pass*. El comité a cargo de conceder el pase estaba compuesto por cinco miembros que incluían reporteros de Fox News, *The Washington Post*, *The New York Times*, y *The Wall Street Journal.* A pesar de tener la solicitud pendiente, Ateba presentó una acción legal contra el Secretario de Prensa de Casa Blanca. Su petición se basó en síntesis en que Política de Pases Permanentes (Hard Pass Policy), acorde a la Primera Enmienda, era irrazonable porque les confería discreción absoluta a las galerías de prensa de la Corte Suprema y del Congreso para determinar quién debe recibir acceso preferente al área de prensa de la Casa Blanca*.* A su vez, alegó que era irrazonable que Casa Blanca le exigiera estar acreditado por otra rama del gobierno antes de solicitar el *hard pass.*

Casa Blanca presentó una moción de Sentencia Sumaria y la corte de Distrito la concedió. En lo aquí atinente determinó que la Casa Blanca actuó de forma razonable bajo la primera enmienda. En desacuerdo, Ateba presentó un recurso de apelación. En lo concerniente, el foro apelativo entendió que, aun asumiendo que la falta del pase permanente es una afrenta a la primera enmienda, las cargas que impone la política de los pases permanentes no son inconstitucionales. <u>Ateba v. Leavitt</u>, *supra*, pág. 121.

Para evaluar las restricciones gubernamentales de libertad de expresión en las instalaciones gubernamentales, consideró en primer lugar, el escrutinio de la primera enmienda que debía ser aplicado. Indicó que el nivel de escrutinio a utilizarse dependía del tipo de foro que el gobierno creó para realizar la expresión.

*Íd., pág. 121.*   El foro apelativo entendió que el área de prensa era un foro no público, a saber:

> We conclude that the White House Press Area is a nonpublic forum. To the extent the White House is generally open to the public — for tours, for example — the restrictions on entry are similar to those imposed at the U.S. Capitol, which is a nonpublic forum. *See Nassif*, 97 F.4th at 977 (noting restricted hours and mandatory security screening of persons and items entering the Capitol buildings). The Press Area has its own set of restrictions. The purpose of the Press Area is to provide "press facilities for correspondents who need to report therefrom," *Sherrill*, 569 F.2d at 129, thereby enabling select journalists to attend briefings by the Press Secretary and to gather information about the administration. Access to the Press Area is limited to journalists who satisfy the White House's admission criteria and secure either a hard pass or a day pass to enter, subject to space availability. […] *Id.*, pág. 122*.*

Más Adelante, el Foro Apelativo indicó que como el área de prensa de la Casa Blanca como era un foro no público, el acceso podía ser restringido, siempre y cuando los requerimientos fuesen neutrales y razonables*.*   "As a nonpublic forum, access to the White House Press Area "can be restricted as long as the restrictions are" viewpoint neutral and reasonable." Ateba v. Leavitt, *supra*, pág. 123; citando a *Cornelius*, 473 U.S. 788 at 800, 105 S.Ct. 3439.

Luego el Tribunal Apelativo indicó que se cumplió con ambos requisitos.  En cuanto a la razonabilidad indicó lo siguiente:

> The restrictions imposed by the Hard Pass Policy easily pass constitutional muster. First, the Hard Pass Policy is reasonable. To meet that requirement, a restriction "need not be the most reasonable or the only reasonable" restriction. *Cornelius*, 473 U.S. at 808, 105 S.Ct. 3439. "[R]easonableness may be established by evidence in the record or even by a commonsense inference." *Price*, 45 F.4th at 1072 (cleaned up). The Supreme Court gives the government substantial leeway to regulate access to a nonpublic forum and has upheld a range of restrictions that were justified in light of the forum's purpose. *See, e.g.*, *Forbes*, 523 U.S. at 682, 118 S.Ct. 1633. Íd., pág. 123.

Más adelante expresó:

Here, the White House has opted to issue hard passes only to reporters who are accredited by either the Supreme Court Press Gallery or a congressional press gallery. That policy allows the White House to rely on the credentialing decisions of established press galleries, which have formed committees of journalists that evaluate the qualifications of reporters who seek to enter nonpublic areas to cover the work of the government. The White House does not have a press gallery and has no comparable vetting system in place. It is surely reasonable for the White House to open the Press Area only to bona fide journalists and to revert to its long-established practice of using press-gallery membership as a measure of a reporter's professional standing. Although Ateba objects to being evaluated by fellow journalists whom he claims are his "competitors," Ateba Br. 18, it is reasonable to allow established members of the profession. [……]

Sobre el requisito de punto de vista neutral, también lo convalidó al afirmar lo siguiente:

Second, the Hard Pass Policy is viewpoint neutral. Viewpoint discrimination is an "egregious form of content discrimination," which occurs when a government regulation "targets not subject matter, but particular views taken by speakers on a subject." *Rosenberger*, 515 U.S. at 829, 115 S.Ct. 2510. The Hard Pass Policy does not reference viewpoints in any way, and Ateba does not allege that either the White House or the Senate Daily Press Gallery denies press credentials based on the content of a correspondent's reporting.

Concluyó el foro Apelativo en <u>Ateba v. Leavitt</u>, *supra*, que la política del *hard pass* no violentaba el derecho de la primera enmienda.

### III.

En el primer señalamiento de error, el apelante alega que el foro primario abusó de su discreción al emitir una sentencia declaratoria y conceder un injunction preliminar y permanente sin celebrar vista evidenciaria, sin recibir prueba alguna, sin permitir descubrimiento de prueba y sin formular determinaciones de hechos.

Evaluado el expediente, le asiste la razón. Conforme expusimos en el acápite del derecho, en nuestro ordenamiento jurídico se permite la petición de *injunction* cuando una parte presente una solicitud basada en que va a sufrir un daño, perjuicio o pérdida irreparable de carácter urgente y entienda que no existe otro remedio en ley. Ahora bien, el injunction preliminar se puede conceder previa notificación a la parte adversa, con el propósito de mantener el *estatus quo* hasta que se celebre el **juicio en sus méritos** y se pueda emitir un *injunction* permanente de ser procedente en derecho. Ese es el trámite vigente y reconocido en nuestro ordenamiento jurídico.

En el presente caso, el apelante presentó una Moción de Desestimación y/o Sentencia Sumaria, bajo el supuesto de que, al amparo de la Regla 10.2 de Procedimiento Civil, los demandantes no tenían derecho a remedio alguno. El foro primario, luego de evaluar los escritos de los demandantes e interventores, dictó sentencia para denegar la solicitud de los demandados. No obstante, en lugar de continuar con el desarrollo regular del procedimiento judicial para atender el *injunction* preliminar y permanente y la Sentencia Declaratoria, el foro primario adjudicó en su totalidad la demanda incoada de manera sumaria. En este quehacer, el foro primario trastocó la normativa que exige que para emitir un injunction permanente es imperativo la **celebración de una vista** en la cual las partes puedan presentar y demostrar sus alegaciones. Como es sabido, la parte demandante, como promovente de los remedios extraordinarios en cuestión, tenía y tiene el peso de la prueba de demostrar su caso. Aquí no se observaron las formalidades que preceden la celebración de un juicio en su fondo.

Más aun el foro primario, en la sentencia reconoció que, "los demandados no presentaron una reglamentación o protocolo escrito de donde surja la referida determinación administrativa de limitar el acceso de la prensa a la Fortaleza, por lo que, **esto limita la evaluación judicial** de la actuación de los demandados a los hechos bien aseverados de la demanda al amparo de la Regla 10.2 (5), supra".   Esta expresión del foro primario demuestra, a todas luces, que la evaluación del asunto ante sí estaba limitada. Esto afirma, la necesidad de la celebración de una vista, antes de emitir el *injunction*, según lo exige nuestro estado de derecho. El parecer del foro primario respecto a si existía o no controversia de hechos no le relevó de ese peso.  En fin, la parte demandante, aquí apelada, tiene que demostrar que la no concesión de ese remedio le ocasione un daño irreparable o que no existe un remedio adecuado en ley.   La acción del foro primario fue precipitada, contraria a la normativa que rige el remedio de injunction, por lo que, no podemos sostenerla en apelación.  Más aun cuando, el efecto del *injunction* permanente a favor de CPI, tiene el efecto de interferir con la facultad de la rama ejecutiva de establecer las medidas de identificación y seguridad que deben regir en la entrada de las conferencias de prensa.   El primer error fue cometido.

En los restantes señalamientos de error, la parte apelante alegó, en síntesis, que la reclamación de los demandantes se circunscribió en el desacuerdo con el requisito de obtener una certificación de prensa, lo cual no equivale a una lesión constitucional plausible.  Indicaron que el proceso de certificación no impone una carga onerosa ni restrictiva.  Agregaron que los demandantes apelados ni siquiera habían sometido una solicitud de certificación. Por tanto, afirmaron que no existe evidencia de

que se les haya denegado la acreditación ni que el sistema haya operado en su contra de forma arbitraria o discriminatoria. Sostuvieron que un litigante no puede impugnar constitucionalmente un procedimiento administrativo que nunca intentó utilizar ni alegar que le ocasionó una carga cuando no se sometió al mismo. Bajo estas circunstancias, la certificación de prensa no constituye una restricción inconstitucional al ejercicio de la libertad de prensa.

En su escrito, los apelantes se refirieron a la norma constitucional aplicable en el ámbito federal para el acceso a un foro no público, como lo es Casa Blanca. Esto, a los fines de que, "el gobierno puede restringir el acceso siempre que las limitaciones sean razonables y neutrales al punto de vista. Ateba v. Leavitt, *supra*, pág. 122, Citando a Cornelius v. NAACP Legal Defense & Educational Fund, 473 U.S. 788, 800 (1985).

Evaluamos.

Los demandantes instaron una demanda en la que alegaron que la Oficina de la Gobernadora de Puerto Rico condicionó el acceso a las conferencias de prensa a aquellos periodistas que posean una Certificación de Prensa expedida por el Departamento de Estado. Junto a la demanda, incluyeron varios anejos, entre ellos, unas convocatorias de conferencia de prensa a celebrarse los días 14 y 16 de diciembre de 2025. En ambos comunicados, al igual que en otros previos, la Fortaleza requirió a los periodistas lo siguiente:

> Los periodistas deberán llevar sus acreditaciones aprobadas por el Comité de Prensa, formado por representantes de los medios, y emitidas por el Departamento de Estado acreditados por el Departamento de Estado que vayan a asistir a la conferencia de prensa confirmen antes […].

Notamos del antes mencionado requisito, que se trata de una directriz general para todos los periodistas que interesan asistir a la conferencia de prensa. De esta, no surge que se le limite el acceso a la conferencia de prensa a ciertos periodistas o medios, ni se distinguió entre sectores o miembros de la prensa. El Estado tampoco impidió el trabajo de periodismo como tal, sino que, para entrar al recinto, de la Fortaleza, que funciona como residencia del gobernante, la persona debe portar una certificación que emite el Departamento de Estado. La instrucción fue a todo periodista, sin distinción del medio al cual pertenezcan o si laboran como *free lance*. Por tanto, la medida no está dirigida a limitar algún discurso ni mucho menos restringe el contenido de lo que se puede recopilar de la conferencia a ofrecerse. De igual manera, de la medida aquí cuestionada no se desprende que el Estado haya establecido un trato diferente para los miembros de la prensa que aquí acuden, a los fines de coartar o limitar su derecho a ejercer como prensa. Es decir, el requisito de tener una certificación de forma alguna limita el derecho a la libertad de prensa ni a ejercer como tal. Mas bien se trata de una instrucción, que, como cuestión de protocolo, deben cumplir aquellos periodistas que interesen cubrir las conferencias de prensa de la Gobernadora. Por consiguiente, la medida de requerir una certificación del Departamento del Estado es una razonable y neutral.

Ahora bien, dado que la Fortaleza no emite acreditaciones de las personas que ejercen como prensa, resulta adecuado y nada impide que se instruya a los periodistas que porten sus acreditaciones emitidas por el Departamento de Estado. Ello es razonable, toda vez que, el Departamento de Estado es el ente designado por la Ley Núm. 22-2000, Ley de Vehículos y Tránsito,

para que acredite quien es un miembro *bona fide* de la prensa general activa. Cónsono a ello, el Departamento de Estado adoptó el Reglamento 6336, el cual está en pleno vigor. Para ejercer sus funciones, a tenor con el Reglamento, el Departamento de Estado designó a un Comité de cinco (5) miembros representativos de los medios para que considerare, evalúen y presente sus recomendaciones. Cabe destacar que las determinaciones tomadas en virtud del Reglamento 6336, pueden ser revisadas mediante el proceso de reconsideración y vistas. Tomamos conocimiento de que las determinaciones del Departamento de Estado relacionadas al Reglamento 6336 han sido revisadas por nuestro foro apelativo.

Mediante el Reglamento 6336 el Departamento de Estado provee una identificación que acredita que el poseedor es Miembro de la Prensa General Activa en Puerto Rico y que así fue certificado por la empresa o corporación para la cual trabaja. Ver Reglamento 6336, Artículo II (A). De manera que, en virtud del Reglamento se proporciona una identificación que le permite al periodista identificarse como miembro de la prensa activa. Nada impide que la referida identificación pueda ser utilizada para que los periodistas logren acceso a los eventos que necesiten cubrir como parte de su trabajo, como lo sería lograr la entrada a las convocatorias de la Gobernadora. Así pues, el beneficio de recibir una certificación de prensa no se limita a la obtención de un rótulo removible para efectos identificar un vehículo de motor a tenor con el Artículo 2.24 de la Ley de Tránsito, Ley 22-2000. Por tanto, al existir un ente administrativo designado para expedir las certificaciones a los periodistas, resulta razonable y neutral la directriz del Estado de solicitar la referida acreditación. Este acto no contra ciñe disposición constitucional alguna ni limita la libertad

de prensa.  Además, se trata de una medida razonable para facilitar la entrada a las convocatorias de prensa.  Ante ello, debemos dejar sin efecto la Sentencia Declaratoria en cuanto decretó que la certificación no es un medio válido de identificación.

De otro lado, la parte aquí demandante-apelada no demostró que realizó las gestiones para obtener la certificación de prensa, en virtud del Reglamento 6336, y que esta fuese denegada.  Así que, existen vías y medios para lograr acceso a las convocatorias de la Gobernadora, las cuales la parte recurrida no ha agotado.  Por existir un medio adecuado, en el ámbito administrativo, para que la parte aquí demandante-apelada obtuviera su acreditación y así lograra acceso a las conferencias de prensa, no procedía el remedio de *injunction* aquí peticionado. En consecuencia, procede desestimar en su totalidad la demanda.

**IV.**

Por las razones antes expresadas, procede revocar la Sentencia aquí apelada y desestimar la demanda.

Lo acordó y manda el Tribunal, y certifica la Secretaria del Tribunal de Apelaciones.


Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones